## KINTYRE FARMERS' CO-OP. ELEVATOR CO. et al. v. MIDLAND NAT. BANK OF MINNEAPOLIS.*

## SAME v. FIRST NAT. BANK OF ST. PAUL.

(Circuit Court of Appeals, Eighth Circuit. September 26, 1924.)

Nos. 6490, 6491.

**I. Bills and notes ⬤═365(I)—Proof that plaintiff is bona fide holder renders evidence of defenses between original parties immaterial.**

In an action by an indorsee on notes where plaintiff assumes the burden of proving in his

*Certiorari denied 45 S, Ct. 226, 69 L. Ed. ——.

case in chief, and introduces evidence to prove, not only his ownership but that he is a bona fide holder in due course, until such evidence is rebutted, evidence of defenses as between the original parties is immaterial.

**2. Bills and notes ⬤═337—Proof of custom between parties to notes held not admissible to impeach title of indorsees.**

Under Minnesota Negotiable Instruments Law, § 56 (Gen. St. Minn. 1913, § 5868), providing that, "to constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith," a custom between grain commission firms and their customers that notes given by customers as collateral security to open accounts were not to be negotiated, but held to await shipments, cannot be shown to impeach the title of banks to whom notes were negotiated in due course, where it is not shown that the banks had actual knowledge that the notes were such collateral notes or that the custom was so general as to charge them with such knowledge.

**3. Bills and notes ⬤═337—Bad faith alone can impeach title of indorsee in due course.**

Bad faith only can render note in the hands of an indorsee subject to defenses between the original parties and mere failure, or even negligent failure, to make inquiry, is not a sufficient basis for a finding of bad faith.

**4. Bills and notes ⬤═348—Demand notes negotiated within 30 days after issue held not dishonored.**

Under statute that, where an instrument payable on demand is negotiated an unreasonable time after issue, the holder shall not be deemed a holder in due course, that in determining what is a reasonable time regard is to be had to the nature of the instrument, the usage of the trade or business, and the facts of the particular case, and that in any case not provided for the rules of the law merchant shall govern, where demand notes, bearing interest payable annually, were given as collateral to an open account their negotiation within 30 days after issue held within a reasonable time.

**5. Bills and notes ⬤═394—Indorsees not required to notify makers of transfers.**

Banks acquiring demand notes by indorsement in due course are not required to notify the makers that they hold the same or to demand payment at any particular time within the period of limitation.

**6. Trial ⬤═139(I)—Verdict should be directed where evidence would not sustain verdict for other party.**

It is the duty of the trial court to direct a verdict where the evidence would not sustain a verdict for the other party.

In Error to the District Court of the United States for the District of North Dakota; Andrew Miller, Judge.

Actions at law by the Midland National Bank of Minneapolis and by the First National Bank of St. Paul against the Kintyre Farmers' Co-operative Elevator Company and others. Judgments for plaintiffs, and defendants bring error. Affirmed.

F. W. Murphy, of Wheaton, Minn. (Campbell & Funke, of Minot, N. D., and

W. H. Stutsman, of Mandan, N. D., on the brief), for plaintiffs in error.

Thomas D. O'Brien, of St. Paul, Minn. (Burke & Burdick, of Fargo, N. D., O'Brien, Horn & Stringer, of St. Paul, Minn., Andreas Ueland, of Minneapolis, Minn., and Alexander E. Horn, of St. Paul, Minn., on the brief), for defendants in error.

Before SANBORN, Circuit Judge, and BOOTH and REEVES, District Judges.

BOOTH, District Judge. Four actions on promissory notes were brought by indorsee banks against the makers. Jurisdiction was based on diversity of citizenship, and the prerequisites duly appeared. Two of the actions were tried together, and a stipulation was entered into by the parties that the other two actions should abide the result. The trial court directed a verdict in each of the two actions in favor of the plaintiff, and judgments were entered. Writs of error have brought the cases here. The parties will be designated as in the court below. Each of the notes was executed by the defendants, bore date August 13, 1921, was payable on demand to the order of E. L. Welch Company, and was delivered to that company about September 6, 1921. Within 30 days thereafter, the Welch Company indorsed the notes, and placed them with plaintiff banks as collateral to loans made by the banks to the Welch Company. In March, 1922, the Welch Company became insolvent, and in June was adjudicated a bankrupt. Thereupon the banks, after demand and refusal, brought the present suits.

The complaint in each suit was in the usual form. The answer of the defendants alleged that the defendant Kintyre Company was a co-operative farmers elevator company of North Dakota, engaged in buying grain and shipping it to the terminal markets, Minneapolis, St. Paul, and Duluth, for sale; that E. L. Welch Company was a corporation engaged in the business of handling grain in said terminal markets on consignment; that the Kintyre Company was accustomed to ship grain to the Welch Company for sale; that the business between the two companies was carried on upon an open account, kept on the books of the Welch Company; that by agreement between the two companies, the Welch Company made advances to the Kintyre Company, as needed, for the purchase of grain; that these advances were made by means of drafts drawn by the Kintyre Company on the Welch Company, which were honored by the latter; that these advance credits were kept on the open account, and against them were entered the proceeds of the grain shipments made from time to time by the Kintyre Company to the Welch Company; that the notes sued upon were executed and delivered to the Welch Company without consideration; that they were executed and delivered upon an oral agreement, viz. that they should be held as collateral to the open account between the Kintyre Company and the Welch Company, should be kept in the files of the Welch Company, and should not be negotiated, but might simply be exhibited to the banks with which the Welch Company did business to show them "that it had said notes as collateral to the account"; that this method of doing business, including the giving of the notes, was of long standing and in accordance with a well-established custom in the grain trade. The answer further alleged that the notes were negotiated by the Welch Company, in breach of faith, and under circumstances amounting to a fraud; that the banks knew of the custom, and were not holders of the notes in due course; that the notes were dishonored when taken by the banks.

With the issues thus joined, the cases came to trial. Plaintiffs proved that they were the owners and holders of the notes which were due and unpaid, after demand. The circumstances under which the notes were taken by the banks were also brought out both upon direct and cross examination of plaintiffs' witnesses; so that at the close of plaintiffs' case there was plenary proof which if uncontradicted, established: that the notes were complete and regular upon their face, the notes, themselves, being in evidence; that plaintiffs became the holders of them before they were overdue and without notice of any previous dishonor; that the notes were transferred by the Welch Company to plaintiffs within 30 days of their issue; that plaintiffs took the notes in good faith and for value; that the notes were received by plaintiffs along with many other notes as collateral security to loans made by them to the Welch Company; that at the time the notes were transferred to plaintiffs, they had no notice of any infirmity in the instruments, or defect in the title of the Welch Company; that the notes were taken by the plaintiffs in the usual course of business; that the Welch Company was still indebted to plaintiff banks respectively in amounts greater than the collateral notes in suit.

In short, the evidence, if uncontradicted, established that the plaintiffs were holders

in due course as defined in section 52 of the Negotiable Instruments Law (Gen. St. 1913, § 5864).

It also appeared from the evidence that when the notes were transferred by the Welch Company to the plaintiffs, the defendants were indebted to the Welch Company, by reason of drafts drawn in excess of the proceeds of the shipments of grain.

Defendants, in putting in their evidence in defense, offered to show: (1) The express agreement between the Kintyre Company and the Welch Company set up in the answer; that is, that the notes were to be held by the Welch Company in its files as collateral to the open account between the parties, and that the notes should not be negotiated. (2) That a custom of long standing existed in the grain trade, in accordance with which commission firms handled the grain of country elevators and grain shippers on open account; that the commission firms advanced credit on the open account to the shippers, and that the proceeds of the shipments of grain were credited on the open account; that the country shippers furnished promissory notes to the commission firms as collateral to the open account, with the agreement that such notes should not be negotiated. (3) That similar collateral notes had been given by the defendants to the Welch Company the preceding year, and at the close of the grain year had been returned to the defendants, although a balance was then owing by the defendants to the Welch Company. (4) That defendants did not know of the transfer of such collateral notes by the Welch Company, either in the year 1920 or the year 1921. (5) That at the time of the insolvency of the Welch Company in March, 1922, defendants were owing the Welch Company the sum of $4,422.91, only. (6) That defendants received no other consideration for said notes than as above stated. (7) That if defendants had known that the Welch Company had negotiated the collateral notes, they would not have shipped any more grain to the Welch Company.

These offers of proof were along the lines of the defenses set up in the answer, and also, in the main, along the lines of the defenses allowable under section 55 of the Negotiable Instruments Law (Gen. St. 1913, § 5867).

But the court sustained objections to the evidence offered; and no further evidence being adduced, granted the motion of plaintiffs for a directed verdict in their favor.

All of the assignments of error, with one or two exceptions, relate to these rulings of

the court. The grounds of the rulings were, in brief, that there was already in the case evidence that the plaintiffs were holders of the notes in due course; that this evidence, unless contradicted, would necessitate a verdict in favor of the plaintiffs; and that unless such evidence was to be introduced, it was immaterial what the defenses were between the original parties to the notes; that the proffered evidence did not tend to show bad faith on the part of plaintiffs; and that, under the circumstances, it would be a waste of time to introduce evidence as to defenses between the original parties.

[1] It is common practice in the trial courts to allow an indorsee-owner and holder of a promissory note, when suing on it, to assume the burden, in his case in chief, of showing that he is a holder in due course, and then to confine the defendant to this issue before taking up the defenses between the original parties to the note; and unless some evidence is adduced tending to show that the plaintiff is not a holder in due course, to refuse to receive evidence of defenses open to the maker as against the payee. First National Bank v. Busch, 102 Minn. 365, 113 N. W. 898; Kipp v. Welsh, 141 Minn. 291, 170 N. W. 222; International Finance Co. v. Northwestern Drug Co. (D. C.) 282 Fed. 920.

This course of procedure, while perhaps not strictly logical, has the advantage of economizing time. It was followed in the instant case without objection.

[2] But the defendants contend that the offered testimony was admissible, because it would have shown the fact of a general custom in the grain trade of commission firms doing business with grain shippers on open account, and taking collateral promissory notes with oral condition attached that they should not be transferred; and that this fact, presumptively known to the plaintiff banks, together with the facts in evidence, that the banks knew of the business relations between the Kintyre Company and the Welch Company, and that they were doing business on open account, were sufficient to put the banks upon inquiry; that such inquiry would have disclosed the further fact that the notes in question were taken by the Welch Company in accordance with such custom and were therefore not to be negotiated; and, further, that such inquiry would have disclosed the specific agreement between the Kintyre Company and the Welch Company that the notes should not be negotiated.

It is further contended that the taking of

the notes by the banks, under such circumstances, and without making inquiry, was evidence from which the jury would have been justified in finding bad faith on the part of the banks, and that they were not holders in due course. We think these contentions cannot be sustained.

Paragraph 56 of the Negotiable Instruments Act (Gen. St. 1913, § 5868) reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

There was no evidence introduced or offered that the banks had actual knowledge that these notes which they received from the Welch Company were collateral notes, delivered on condition that they should not be transferred, or even that they were collateral notes. And the proffered evidence as to the custom was, in our opinion, properly excluded as not tending to show bad faith on the part of the banks. There was no evidence offered that the banks had actual knowledge of such custom, nor could it be shown that the custom was so general that the banks must be held to have had knowledge of it, for the uncontradicted evidence had already shown that both banks, in prior years, had received from the Welch Company similar notes, executed by the Kintyre Company, which are now claimed to have been collateral notes only. There was no offer to show that such transfers of the notes to the banks were exceptional. The most that could have been shown was a custom for commission firms to take collateral notes, and sometimes to keep them in their files, and sometimes to transfer them.

[3] The proffered evidence, therefore, would not have shown that the banks had knowledge of such facts that their action in taking the notes amounted to bad faith.

Mere failure or even negligent failure to make inquiry is not a sufficient basis for a finding of bad faith.

In Murray v. Lardner, 2 Wall. 110, the court, in its opinion, at page 121 (17 L. Ed. 857), said:

"Suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title. That result can be produced only by bad faith on his part."

The court pointed out in its decision that the old doctrine of gross negligence and suspicious circumstances which once prevailed in England, had been repudiated by the English courts and had no standing in the Supreme Court of the United States.

The rule thus laid down is followed by the great majority of courts, both federal and state, in this country.

See Daniel on Negotiable Instruments (6th Ed.) § 775, where the authorities are collected.

The rule has been very recently recognized by his court in the case of Meyer v. Guardian Trust Company, 296 Fed. 789, where the authorities are again reviewed.

The same rule prevails in the state court of North Dakota, First Nat. Bank of St. Thomas v. Flath, 10 N. D. 281, 86 N. W. 867, and in the state court of Minnesota, First Nat. Bank v. Busch, 102 Minn. 365, 113 N. W. 898; Kipp v. Welsh, 141 Minn. 291, 170 N. W. 222; Midland National Bank v. Farmers' Co-operative Elevator Company, 196 N. W. 275.

The last case is substantially on all fours with the cases at bar.

It is to be borne in mind that the notes, at the time they were transferred by the Welch Company to the banks, were valid, enforceable obligations. It is admitted that they were given as collateral security to the open account; and the evidence disclosed that at the time they were transferred to the banks, the open account showed an indebtedness by the Kintyre Company to the Welch Company.

In the view we have taken of the cases at bar, we think it unnecessary to discuss the question of the admissibility of oral testimony to vary the terms of the written instruments. The defense here sought to be shown by such testimony was not available against a holder in due course.

[4] It is further contended by the defendants that the notes were dishonored when taken by the banks. The notes were payable on demand. The Negotiable Instruments Act, § 53 (section 5865), provides:

"Where an instrument payable on demand is negotiated an unreasonable length of time after its issue, the holder is not deemed a holder in due course."

The question arises: What is an unreasonable length of time?

Section 193 of the Negotiable Instruments Law (section 6005) reads as follows:

"In determining what is a 'reasonable

time' or an 'unreasonable time,' regard is to be had to the nature of the instrument, the usage of trade or business (if any) with respect to such instruments, and the facts of the particular case."

Section 196 of the same act (section 6008) reads:

"In any case not provided for in this act, the rules of the law merchant shall govern."

The Supreme Judicial Court of Massachusetts has held, in determining what is a reasonable time, under the Negotiable Instruments Law, that in the absence of evidence of a custom or usage, 60 days would be a reasonable time. This was the time fixed by statute in Massachusetts, prior to the Negotiable Instruments Law, for making demand upon promissory notes, payable on demand. Merritt v. Jackson, 181 Mass. 69, 62 N. E. 987; Plymouth County Trust Co. v. Scanlan, 227 Mass. 71, 116 N. E. 468.

In Minnesota, prior to the passage of the Negotiable Instruments Law, the statutory rule, at one time 60 days (section 4, c. 23, R. S. 1866), was later changed to 5 months (chapter 436, Laws of 1909).

By the laws of North Dakota, prior to the Negotiable Instruments Law, one year from date was made the apparent maturity of a demand note if it bore interest; six months, if it did not bear interest. Section 4892, Rev. Code N. D. 1895. It is probable that these statutory provisions have been repealed by section 197 of the Negotiable Instruments Law (section 6009). The law merchant therefore governs.

No trade usage was shown upon the trial of the present cases to exist in respect to the time for presentment of demand notes, and the fact was undisputed that the notes were transferred by the Welch Company within 30 days from the time of their issue. The notes bore interest at nine per cent. per annum, payable annually. If they were collateral to the open account, as claimed by the defendants, it was a fair inference that they were to run for a number of months, inasmuch as the open account ran during the grain year.

In view of the foregoing, we think that the question of reasonable time, in the instant cases, was one of law, 8 C. J. p. 1070; Paine v. R. R. Co., 118 U. S. 152, 160, 6 S. Ct. 1019, 30 L. Ed. 193, and that the court was fully justified in holding that the notes were not dishonored when taken by the banks.

[5] Estoppel is claimed by defendants against the banks in not sooner notifying defendants that the notes had passed into the hands of the banks, and in not demanding payment. The claim cannot be sustained. We know of no rule requiring the banks, being holders in due course, to give notice that they held the notes, or to demand payment at any particular time, within the period of the statute of limitations.

[6] The court rightly granted the motions of plaintiffs for directed verdicts, in their favor. It is the well-established rule in this circuit that:

"It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but is of so conclusive a character that the court, in the exercise of a sound judicial discretion, would set aside a verdict in opposition to it. And when the trial court has directed a verdict upon conflicting evidence the appellate court may not lawfully reverse it, or the judgment founded upon it, unless, upon a consideration of the evidence, it is convinced that it was not of such a conclusive character that the court below, in the exercise of a sound judicial discretion, should not have sustained a verdict in the opposite direction." Fricke v. International Harvester Co., 247 Fed. 869, 160 C. C. A. 91, and cases cited.

The evidence in the cases at bar was clearly of such character as to bring them within the rules stated.

Judgments affirmed.