FRICKE v. INTERNATIONAL HARVESTER CO.

(Circuit Court of Appeals, Eighth Circuit. November 12, 1917.)

No. 4863.

1. TRIAL ⪜139(1)—DIRECTION OF VERDICT—GROUNDS.

It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but is of so conclusive a character that the court, in the exercise of a sound judicial discretion, would set aside a verdict in opposition to it.

2. APPEAL AND ERROR ⪜997(3)—REVIEW—DISCRETION OF LOWER COURT—DIRECTION OF VERDICT.

When a trial court has directed a verdict upon conflicting evidence, the appellate court may not lawfully reverse the judgment founded upon it, unless upon a consideration of the evidence it is convinced that it was not of such a conclusive character that the court below, in the exercise of a sound judicial discretion, should not have sustained a verdict in opposition to it.

3. CONTRACTS ⪜94(1)—FRAUDULENT REPRESENTATIONS—NATURE AND ELEMENTS.

False representations, which will invalidate a contract, must be such as to constitute actual or legal fraud; and indispensable elements of such fraud are (1) that the representations must have been material to the contract or transaction at the time they were made; (2) the misrepresented facts must be facts of which the victim is ignorant, and of which a person of ordinary sagacity and diligence would have acquired no knowledge; (3) the misrepresentations must be well calculated to deceive, and to induce the victim to make the contract; and (4) they must have induced him to do so.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraud.]

4. BILLS AND NOTES ⪜520—VALIDITY—FRAUDULENT REPRESENTATIONS.

Evidence *held* insufficient to sustain the defense that defendant was induced to sign a note as surety for an indebtedness for which she was already liable as guarantor, by false representations made by the creditor's agent several months before as to the solvency of the principal maker, where she knew, when the representations were made and, at the time she signed the note, that his indebtedness was large and increasing.

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Action at law by the International Harvester Company against Amelia E. Fricke. Judgment for plaintiff, and defendant brings error. Affirmed.

The International Harvester Company, a corporation, sued Mrs. Amelia E. Fricke on a promissory note for $3,381.64, payable to it, dated October 27, 1914, signed by her and C. A. Bard. She defended on the ground that the agents of the Harvester Company had induced her to sign the note to enable Bard to conduct his business as an implement dealer with that company, by false representations which they made to her on March 5, 1912, February 14, 1913, and June 5, 1914, to the effect that Bard was solvent and able to pay his liabilities, when they knew these representations were false, and she had no notice or knowledge of that fact and believed them to be true. At the close of the trial the court instructed the jury to return a verdict for the plaintiff, and this ruling is the alleged error assigned. Mrs. Fricke and Bard testified to the representations, and the agents testified that they never made any of them. Laying aside the testimony of the agents where it conflicts with that of

Mrs. Fricke and Bard, the material facts, of which there was substantial evidence, were these:

C. A. Bard was an implement dealer at Creighton, Neb., and dealt with the plaintiff from 1894 until 1915. Mrs. Fricke and her husband were engaged in farming 12 miles from Creighton from 1880 until 1893, when he died. Mrs. Fricke continued the farming operations from that time until the day of the trial. Mr. Fricke and Mr. Bard were friends, and before Mr. Fricke's death he advised his wife to consult Mr. Bard and follow his advice. It was the practice of the plaintiff annually to make an agency contract with an implement dealer, and to take a guaranty of the payment of any liability which he should incur during the following year, and at the end of the year to take promissory notes for any balance he then owed it, and it followed this practice in its dealings with Bard. Mrs. Fricke was his friend, she wanted him to succeed, and she testified that she wanted to help him, and that at his request, and without any representation by or solicitation from the plaintiff or its agents, she signed' for Mr. Bard and with him his annual agency contracts and his promissory notes for balances due to the plaintiff from 1904 until March 5, 1912. At that time she owed the plaintiff $4,784.83 on promissory notes signed by her and Bard on January 1, 1912, and January 2, 1912, for the balance owing the plaintiff upon Bard's 1911 business, and $7,094 on their notes and guaranty contracts for balances owing the plaintiff on Bard's business for 1910 and prior years, amounting in the aggregate to $11,878.93. Bard was making annual sales of from $30,000 to $50,000 a year, and he wanted to obtain an agency contract and to make a guaranty contract for the year 1912. On the business for 1911 he had lost about $5,000, and had given the notes of himself and Mrs. Fricke for the $4,784.83, representing substantially this loss, payable between May 31 and October 2, 1912. Thereupon Bard and Mrs. Fricke and Lyons and Kilbourn, agents of the plaintiff, met. Bard wanted the agency contract. Lyons and Kilbourn wanted a payment of the $7,094 that was due, or a renewal of the notes. Bard asked Mrs. Fricke to sign renewal notes and the guaranty contract for 1912. She said she did not like to do so, because she had heard that Rehmer, another agent of the plaintiff, had said that Bard was not good. Kilbourn, whom she met for the first time that day, then told her that Bard was good, that he had plenty of property and would have $7,000 surplus if he was sold out at that time, and told her to sign the papers and help him, as he wanted to have longer time and his credit would be better, and there never would be any trouble for her. Thereupon she signed the guaranty contract and the agency contract for 1912 and the renewal notes for the $7,094, which were seven in number, payable respectively on the 1st days of the months of April, May, June, July, August, September, and October, 1912. Bard was unable to reduce his indebtedness to the plaintiff in the year 1912, and he and Mrs. Fricke on February 14, 1913, owed the plaintiff $12,990. Bard wanted an agency contract for 1913; Lyons and Kilbourn wanted payment of the $12,990, or security for its payment. Mrs. Fricke, Bard, Lyons, and Kilbourn met. Mrs. Fricke said, "What do they want with me?" Bard replied, "They want a real estate mortgage." Mrs. Fricke said, "No, never." Lyons said, "What do you want to do, pay this or give a mortgage; there is no harm, we will guarantee that; we will let Bard have the interest cheaper a cent, and I will hold the mortgage." He also told her that, if she did nothing, they would have to apply for a receiver of Bard's property, or for a judgment. Lyons and Kilbourn both said that Bard was good, and one of them said if he was then sold out there would be a surplus of $5,000. Mrs. Fricke said, "Can you make it Mr. Bard?" Bard replied, "I have $2,000 to pay on the first payment, and if you give me so many years, I forgot how many years, five or six, I can make it." They then drew six notes, for $2,000 each, payable respectively on the 1st days of October in each of the years 1913, 1914, 1915, 1916, 1917, and 1918, and a mortgage on Mrs. Fricke's farm, or a part of it, to secure the notes, and she signed the notes and mortgage. Bard was more successful in 1913. He paid all his liabilities for that year, and the mortgage note of $2,000 payable October 1, 1913, so that in June, 1914, Mrs. Fricke's liability had been reduced $2,000. On June 5, 1914, Bard wanted an agency contract and a guar-

anty contract for the year 1914. Mr. Boltz one of the plaintiff's agents, was present. Mrs. Fricke said she was getting sick and tired of monkeying around. Boltz said, 'Don't talk foolish; Bard is good for it; why not sign? we don't want any fuss about that;' and she signed. When on October 1, 1914, the second mortgage note came due, Bard failed to pay it, and on October 27, 1914, he and Mrs. Fricke owed the plaintiff $3,381.64 on the guaranty contract relative to the business of the year 1914, and they gave their note in suit therefor.

There was no evidence of any representation or statement of any agent of the plaintiff relative to the financial standing of Bard at the time this note was made, or of any other representations than those made on March 5, 1912, February 14, 1913, and June 5, 1914; but Mrs. Fricke testified that in giving that note she believed and relied upon the representations made at those times, and that she would not have signed the note had they not been made. She also testified at one time: "Q. During the time you was signing all these papers, did you make any investigation as to what Mr. Bard's financial condition was? A. Yes: I asked several times. I did not know nothing about business, but he showed me his bank books, and they looked good, and he was doing a good business, and I supposed everything was all right. Q. You mean Mr. Bard showed you his bank books? A. Yes, sir. Q. You knew, of course, at the time you signed the mortgage for $12,000, that he was in debt some? A. Yes; that is what they wanted the mortgage for." And at another time: "Q. You never did make any investigation about Bard around there in Creighton? A. No, sir. Q. You signed this $12,000 mortgage and all these other papers, and never made any inquiry about Bard at all no time for the 12 years you have been signing? A. No, sir." Mrs. Fricke is a German woman, who, with a hired man and her son, who was 26 years old, when she testified, had carried on her farm of 160 acres, and perhaps more, from the death of her husband in 1893 until the time of the trial. She had not been engaged in other business, and was not familiar with other business transactions. Bard was insolvent after the year 1911, when he lost about $5,000 in his business. On March 1, 1911, Bard made a statement in writing to the plaintiff of his assets and liabilities, from which it appeared that, aside from $950 of incumbrances on his real estate, he owed $8,200 and had available assets to the amount of $11,900. There was no evidence that the plaintiff or its agents had any other knowledge of his assets or liabilities, except the knowledge of his indebtedness to the plaintiff, his inability to pay it, of which Mrs. Fricke was equally well aware, and this statement which Bard had made.

H. C. Brome, of Omaha, Neb. (Clinton Brome, of Omaha, Neb., on the brief), for plaintiff in error.

Arthur F. Mullen, of Omaha, Neb. (William S. Elliott, of Chicago, Ill., on the brief), for defendant in error.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

SANBORN, Circuit Judge (after stating the facts as above). [1, 2] It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but is of so conclusive a character that the court, in the exercise of a sound judicial discretion, would set aside a verdict in opposition to it. And when the trial court has directed a verdict upon conflicting evidence the appellate court may not lawfully reverse it, or the judgment founded upon it, unless, upon a consideration of the evidence, it is convinced that it was not of such a conclusive character that the court below, in the exercise of a sound judicial discretion, should not have sustained a verdict in the opposite direction. Patton v. Texas & Pacific

Ry. Co., 179 U. S. 658, 660, 21 Sup. Ct. 275, 45 L. Ed. 361; Woodward v. Chicago, M. & St. Paul Ry. Co., 145 Fed. 577, 578, 75 C. C. A. 591, 592, and cases there cited; Canadian Northern Ry. Co. v. Senske, 201 Fed. 637, 644, 120 C. C. A. 65, 72.

[3, 4] The defendant seeks to avoid her contract to pay the plaintiff $3,381.64 on the ground that she was induced to make it by the false representations of the plaintiff relative to the financial standing of Mr. Bard. False representations and acts induced thereby, which constitute actual or legal fraud, are essential to such a cause of action or defense. Indispensable elements of such a fraud are: (1) The materiality of the misrepresentations to the contract or transaction at the time they were made; (2) the misrepresented facts must be facts concerning which the victim is ignorant, and of which a person of ordinary sagacity and diligence in his place would have acquired no knowledge; (3) the misrepresentations must be well calculated to deceive and to induce the victim to make the contract; and (4) they must have induced him to do so. Farwell v. Colonial Trust Co., 147 Fed. 480, 483, 78 C. C. A. 22, 25. Mrs. Fricke and Mr. Bard had been friends before the death of her husband in 1893, and have been so ever since. She always wanted to help him. From 1904 until March 4, 1912, she had signed agency contracts, guaranty contracts, and promissory notes for and with him at his request, without any consideration and without any suggestion or representation by the plaintiff or its agents, until she had become indebted thereon for more than $12,000. On March 5, 1912, she knew that she owed on Bard's notes and contracts $12,000, that $7,094 of this indebtedness arose out of transactions prior to 1911, that this prior indebtedness was overdue, that Bard could not pay it then, and that during the year 1911 he had lost $4,784.83, for which she had given her note in January, 1912. At Bard's request she signed new notes for the $7,094 on March 5, 1912. She was not so ignorant of Bard's precarious financial condition that a person of ordinary sagacity and diligence in her place would not have acquired knowledge of it. She then met Lyons and Kilbourn for the first time, and it is incredible that she was induced by the statement as to her friend Bard's financial standing of one of these strangers, acting for the opposing party to the contracts, for her creditor, to sign the renewal notes of that date. On February 14, 1913, she knew all she had theretofore known of Bard's doubtful financial situation and this much more: That he had not paid the notes for $4,784.83 which she had signed with him in January, 1912, that his indebtedness had not decreased, but had increased since March 5, 1912, that he could not then pay that indebtedness, that plaintiff would apply for a receiver of his property and business, or for a judgment on the notes which she and Bard had signed, unless its claim was secured by a mortgage upon her farm. She said at first that she would not give the security, but when she found that by making the mortgage she could get such an extension of the time of payment, that Bard would be required to pay only $2,000 a year for six years, and Bard requested her to make the new notes and mortgage, she said, "Can you make it Mr. Bard?" and he replied, "I have $2,000 to pay

on the first payment, and if you give me so many years, I forgot how many years, five or six, I can make it." Thereupon she signed.

It is true that Lyons and Kilbourn told her that Bard was good, that he was worth $5,000 above his debts, that there was no harm, and they would guarantee that. But she was already bound by notes and contracts she had signed to pay the debt for which she gave the new notes and the mortgage. Receivership for her friend or judgments against both of them was the alternative, if she failed to give the security. If she believed the statement of the agents that Bard was good, and if sold out then would have a surplus of $5,000 above his debts, why did she not permit the receivership or the judgments, and thus relieve herself of the entire liability? The evidence in this case is too conclusive to leave a doubt that it was not because of the statements of the agents about the financial situation of Bard, but because of her friendship for Bard and of his request for her help, that she signed the notes and the mortgage. Moreover, neither she nor any person with ordinary sagacity and diligence in her circumstances and with her knowledge of Bard's repeated failures, his increased indebtedness, and his inability to pay, could have failed to be aware of his precarious financial situation. For these reasons, and also because the representations of March 5, 1912, and February 14, 1913, were not made by the agents for the purpose of inducing the making of the note of October 27, 1914, and it was not the natural and probable effect of those representations to induce the making of that note, and those representations were so remote in time and under such different circumstances that it is preposterous to believe that they induced the making thereof, or of the guaranty contract, or agency contract of June 5, 1914, these representations are here laid aside.

The note in suit was not given for any part of the indebtedness for which the notes and contracts of 1913 and prior years were made. It was given for the amount due at its date, October 27, 1914, under the agency contract and guaranty contract of June 5, 1914. There was no representation made at the time the note was given or after June 5, 1914, and all the representation that was made on that day was that of Boltz, the plaintiff's agent, in the words: "Don't talk foolish; Bard is good for it; why not sign? We don't want any fuss about it." At that time Bard had been able, since the mortgage was given in February, 1913, to pay all the liabilities incurred that year and one of the six notes for $2,000, which had been given on February 14, 1913, for the indebtedness of prior years. It is too great a stretch of faith or of imagination to believe that Mrs. Fricke was so ignorant of Bard's financial situation and so influenced by this statement of Boltz that it either caused, or assisted to cause, her to sign these contracts or the note she made more than four months later, and the conclusion is irresistible that upon the evidence in this case the court below, in the exercise of a sound judicial discretion, could not have sustained a verdict in her favor.

The judgment below must therefore be affirmed; and it is so ordered.