### AGRICULTURAL INS. CO. v. HIGGINBOTHAM.

(Circuit Court of Appeals, Eighth Circuit. June 2, 1921.)

No. 5472.

Insurance ⬡83 (1)—Evidence held insufficient to authorize submission of case to jury.

Evidence *held* insufficient, as matter of law, to sustain the burden resting on defendant, an agent of plaintiff insurance company, to establish by clear and convincing proof that a provision of his contract of agency limiting the amount for which he was authorized to issue a policy on grain had been orally waived or annulled, and overruling of a motion by plaintiff for directed verdict *held* error.

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Action at law by the Agricultural Insurance Company against Charles E. Higginbotham. Judgment for defendant, and plaintiff brings error. Reversed.

Arthur R. Wells, of Omaha, Neb. (Stout, Rose, Wells & Martin, of Omaha, Neb., on the brief), for plaintiff in error.

P. E. Boslaugh, of Hastings, Neb. (W. G. Hastings, of Lincoln, Neb., and Stiner & Boslaugh, of Hastings, Neb., on the brief), for defendant in error.

Before SANBORN and STONE, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge. The Agricultural Insurance Company, a corporation, the plaintiff below, brought an action against Charles E. Higginbotham, the defendant, for that, while he was its agent, authorized to deliver its policies of insurance against fire and legally bound by its line sheet, which constituted a part of his agency contract, not to issue any of its policies for an amount in excess of $2,500 on any lot of grain in elevators, he issued a policy of the plaintiff on August 18, 1916, for $8,000 to the E. Stockham Grain Company on its grain in elevators; that grain was burned on August 21, 1916, the plaintiff was obliged to pay and did pay to the assured on November 7, 1916, $8,000

---

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on account of that loss; and it demanded judgment against the defendant for the difference between $2,500, the limit of the amount the defendant was permitted to insure by a policy of the plaintiff, and $8,000 and interest on that difference from November 7, 1916. The only defense that it is necessary to consider in this court is that the plaintiff, after the defendant's appointment as its agent, as the defendant avers in its answer—

"instructed, urged, requested, and authorized defendant to solicit for insurance all kinds of property included within the classes upon which it issued contracts of insurance, in any amount that could be procured, and to issue policies and contracts of insurance thereon and in such amounts as could be procured, not violating the established rule, practice, and custom as to excessive insurance having regard solely to the value of the property insured."

Mr. Freeman was the state agent of the plaintiff, and was authorized to waive limits of the amounts of risks on its behalf. Mrs. Harrington was the defendant's business manager. She testified that before the policy in question was issued she had a conversation with Mr. Freeman, in which he told her to "get the business and send it on; get as large a line as I could and send them on." Freeman admitted that he had a conversation with her, and that he asked her to increase the plaintiff's volume of business, so that the company could get a larger premium income, and that he might have used the term "increase our line in Hastings," meaning the general volume of its business, and that the matter of excess lines, the specific writing of an excess liability on a particular risk, was mentioned in the conversations, and that there was a distinction between lines meaning the general volume of business and such excess lines. At the close of the trial the plaintiff requested the court to instruct the jury to return a verdict in its favor; the court refused to do so, and charged the jury that the defendant was bound by the limitation of $2,500 on grain in elevators, fixed by the line sheet, which was delivered to him and became a part of the contract of agency, and that the plaintiff was entitled to the verdict unless they believed the testimony of Mrs. Harrington as to her conversation with Mr. Freeman, but that if they believed her testimony the defendant was entitled to the verdict. These rulings are assigned as error.

In Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 659, 21 Sup. Ct. 275, 276 (45 L. Ed. 361), speaking of the submission of a case to the jury, Mr. Justice Brewer said:

"It is well settled that the court may withdraw a case from them altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it."

In Bell v. Carter (8th C. C. A.) 164 Fed. 417, 419, 420, 90 C. C. A. 555, 557 (19 L. R. A. [N. S.] 833), Judge Van Devanter, now Mr. Justice Van Devanter of the Supreme Court, said:

"Whilst it is true that a substantial conflict in the evidence must be determined by the jury as a question of fact, it is also true that when the evidence is undisputed, or is so clearly preponderant that it reasonably admits of

but one conclusion, the proper disposition of the case upon the evidence becomes a question of law, to be determined by the court."

This court has repeatedly held that:

"It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting but is of so conclusive a character that the court in the exercise of a sound judicial discretion would set aside a verdict in opposition to it." Woodward v. Chicago, M. & St. P. Ry. Co. (8th C. C. A.) 145 Fed. 577, 578, 75 C. C. A. 591, 592.

The question in this case is: Was the conflict in the evidence so unsubstantial, and all the evidence taken together so clearly preponderant in support of the plaintiff's cause of action, that in the exercise of a sound judicial discretion a court could not reasonably sustain a verdict in opposition to it? We turn to the testimony for the answer. Repeated readings of the evidence have forced our minds to the conclusion that much depends upon the sense and meaning in which the words "line" and "lines" were used and understood by Mrs. Harrington and Mr. Freeman in the conversation to which she testified—much depends upon whether those words meant (1) the limit or limits of the amount of insurance which might be written by the defendant on lots of a specific class of property such as grain in elevators or on lots of specific classes of property, or (2) the class or classes of property themselves and the volume or volumes of business or risks which the defendant should procure for the plaintiff. Upon the question of the use and meaning of these words "line" and "lines," the testimony of the defendant in his own behalf is instructive. He testified that he had a conversation with Mr. Freeman regarding the business on September 9, 1915, in which Mr. Freeman was asking him for more business, and in which he promised him more, but told him that Hastings was a cut-rate town and "we would have to meet the rates"; that there were rates fixed by a board for some towns in Nebraska, but Hastings was not one of them, and business in that town was written at cut rates. He further testified, among other things, as follows:

"I told him I could get a large line of insurance on stocks and buildings and on grain, and if he would meet the rates that we would give him his share of the business of the office. * * * I told him that the other companies that we had in the office accepted these lines, and we wrote up the policies and submitted to them, and if his company would do the same we would be glad to give them their share of the business."

His answer to the question, "What, if anything, did he say regarding the limit that you could go on taking lines of insurance for the Agricultural Insurance Company?" was:

"He said the Agricultural was a large company, and they had good facilities for reinsurance, and they wanted the business and would carry good lines."

In this testimony of Mr. Higginbotham the word "line" was used once, and the word "lines" three times. And the sentence in which either of the words was used in each case demonstrates the fact that

it was not used in the sense of the limit or limitation of the amount of insurance that might be taken upon a single risk, or on a class or classes of risks, but it was used in each case in the sense either of the class or classes of risks, or the amount or volume of insurance business and of premiums that might be obtained.

Bearing in mind, now, that by the written or printed terms of the line sheet, which was in reality a part of the contract of agency, the defendant was expressly limited to a risk of $2,500 or less upon any lot of grain in elevators, and that the sense in which the words "line" and "lines" were used in the conversations between Mrs. Harrington and Mr. Freeman is material, let us examine the testimony of Mrs. Harrington, on which the verdict in this case rests. So far as that testimony is material to the issue, it was as follows:

"Q. Now, what did he say regarding the business of insurance? A. Previous to that we did not give the Agricultural a great deal of business because, if I may say, they were very stiff on rates; so I talked to Mr. Freeman about that at that time, and he said, 'Well, now that I have transferred this company to you people, we will expect you to give us a larger line.' * * * He says, 'What lines can you give us?' I says, 'I know I can give you some dwelling house and household goods, if you will meet the prevailing rate on dwelling houses.' And he says, 'What is that?' I says, 'The rate for fire, lightning, and tornado, which is called combined, is 1 per cent. and the prevailing rate for fire and lightning is 60 cents—'

"Q. For what term? A. Five years; usually written for five years; dwellings and household goods for five years. And Mr. Freeman says, 'All right, I will just meet that rate.' * * * And he says, 'I want some business on good stocks and buildings and other lines;' and he says, 'They are different rates. each building has a different rate, and isn't like dwelling houses or household goods.' * * *

"Q. Was there anything said in that conversation regarding the limit that you might go? A. No, sir; Mr. Freeman never mentioned any limit on anything to me.

"Q. Well, I don't mean the line sheet; but was there anything said by him at that time to you as to how far you might go in taking on a risk so far as its value? A. Of course he knew we would go according to the value. I think he had that much confidence in us that we wouldn't give him anything that was overvalued; but according to the value we would submit the line, and he would take care of it.

"Q. Did he say he would take care of it? A. I don't remember as he said just that; talked over about lines; told me to get the business and send it on; get as large a line as I could and send them on.

"Q. What do you mean by 'lines'? A. Mean the amount they call 'lines,' the amount that is covered on a risk or dwelling house."

Here the material testimony of Mrs. Harrington upon the issue in hand closes. Note that the last answer here is not, nor did Mrs. Harrington in her testimony say that Freeman meant or understood, or thought she meant by the word "line," or by the word "lines," the amount or the amounts that is covered on a risk or dwelling house, and that her testimony goes no further than the bare statement that she meant that. Yet, in the last analysis, it is upon this last answer of Mrs. Harrington that this verdict rests. And if this answer means anything, it means that Mrs. Harrington in her conversation with Mr. Freeman meant by the words "line" and "lines" the limit or limits of insurance that the defendant might lawfully place upon risks

taken by him for the plaintiff. So it is that, if that was not the meaning and effect of these words, there is no evidence to sustain the verdict.

But the testimony of Mrs. Harrington itself demonstrates the fact that such was not and could not have been the meaning of either of these words in any of the conversations or in any of the testimony she gave prior to the answer to this last question. The first time one of these words was used in that conversation, Freeman asked the defendant and Mrs. Harrington, his business manager, for a larger line, and that could have meant nothing but a larger share or volume of insurance business, not a larger limit on the amounts that they might place on different risks or classes of risks, for those limits were in the control of Freeman, and not of the defendant. The second time one of these words was used was when Freeman asked, "What lines can you give us?" and the answer was, "I know I can give you some dwelling house and household goods;" and the third time was when Freeman said, "I want same business on good stocks and buildings and other lines." In these places the word "lines" unquestionably meant classes of risks, certainly not limits as to the amounts to be risked, on specific lots or classes of property. The fourth time was when Mrs. Harrington testified, not that Freeman said, but that she and the defendant were to submit the line, and he would take care of it. That clearly meant that they would submit the class of risks, not the limit or limits of the amounts that might be placed on specific risks or classes of risks, for Mrs. Harrington herself testified that Mr. Freeman never mentioned "any limit or anything" to her. The fifth and sixth times that one of these words was used was when Mrs. Harrington testified that Freeman talked over the line, and told her to get the business and send it on; get as large a line as she could and send them on. Here, again, these words could not have meant limits of amounts of insurance on lots of different classes of property, because she testified he did not talk of such limits with her, and those limits were certainly not what she was to send on to him. The words could have meant nothing but classes of insurance business or risks.

This, then, was the state of the evidence on the crucial issue of this case when it closed. That evidence proved conclusively that by the printed line sheet, which became a part of the agreement of agency, the defendant was legally bound not to issue one of the plaintiff's policies of insurance on any lot of grain in elevators for an amount in excess of $2,500. The defendant pleaded and claimed that this agreement of limitation on the amount to be issued on grain and on the amounts to be issued on other lines or classes of risks was abrogated and annulled by the conversation between Mrs. Harrington and Mr. Freeman to which she testified. On well-settled principles such an abrogation of such a written or printed contract may not be lawfully adjudged without clear and convincing evidence that there was an agreement, understanding, and intention of both of the parties thereto that the original contract should be annulled and thenceforth held for

naught. The burden was upon the defendant to establish such an agreement by evidence of that nature. Mrs. Harrington testified that nothing was said by Mr. Freeman about these limitations, or the original contract which embodied them, that they talked of lines or a line of insurance business, and that she meant by those words the amount or the limit of an amount that is covered by a risk on dwelling house. But the sentences in which she testified that the words "line" and "lines" were used in the conversations between her and Mr. Freeman are such that they could not have conveyed such a meaning to any one who heard them, and they do not convey such a meaning to any one who reads them. And the conclusion is that there was no substantial evidence to sustain the defense that the limitation on the amount for which the defendant might issue a policy of the plaintiff for grain in elevators embodied in the line sheet, which became a part of the contract of agency, was ever abrogated, waived, or modified. The evidence of the existence of that limitation at the time the defendant issued the policy under consideration was so clearly preponderant that no other conclusion was reasonably admissible, and the court fell into an error in refusing to instruct the jury to return a verdict for the plaintiff.

The facts that in January, 1916, Mrs. Harrington wrote a policy of $2,500 on the contents of a garage, which was a prohibited risk under the agency contract, and Freeman approved it, but warned her not to issue another on a risk of that class, and that she wrote a policy of $3,000 to one Spotts on a stock of clothing, when the limit thereon under the contract was $2,500, and the plaintiff canceled it on receipt of the daily report, and wrote a letter to the defendant that it could not carry it at the stipulated rate, have not been overlooked. But the court below rightly held, and charged the jury, that these facts constituted no estoppel or waiver by the plaintiff of the limitation under consideration, and were immaterial unless they found the evidence sustained the defense based on the conversation between Mrs. Harrington and Mr. Freeman. They are not, therefore, material or relevant to the question of law that is decisive of this case in this court, and for that reason they have not been discussed.

Let the judgment below be reversed, and let the case be remanded to the court below, with instructions to grant a new trial.