## DENVER PARK & AMUSEMENT CO. v. PFLUG.

(Circuit Court of Appeals, Eighth Circuit. December 9, 1924.)

No. 6703.

**1. Theaters and shows ⊃6—Injury by amusement device held not chargeable to owner's negligence.**

Injury to plaintiff in using an amusement device *held*, on the evidence not due, as alleged, to negligence of the owner in failing to provide an additional guard.

**2. Theaters and shows ⊃6—Failure of owner of amusement device to provide against accident, which was contrary to long experience, not negligence.**

Where during the season 60,000 persons, including children, used an amusement device with no accident, except the one in which plaintiff was injured, the owner was not chargeable with negligence in failing to anticipate and provide against it.

In Error to the District Court of the United States for the District of Colorado; Orie L. Phillips, Judge.

Action by Lois Pflug against the Denver Park & Amusement Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Edwin H. Park, of Denver, Colo., for plaintiff in error.

Phillip Hornbein, of Denver, Colo., for defendant in error.

Before LEWIS, Circuit Judge, and MUNGER and MILLER, District Judges.

LEWIS, Circuit Judge. Defendant in error went with friends to the amusement park of plaintiff in error on the evening of September 5, 1921. An admission fee was paid to enter the park, and in the park there were various places of amusement which required additional entrance fees. Mrs. Pflug walked about the park, spent some time in dancing, and then went with some of her friends into a place called Crack the Whip. From there they went to another place of amusement called Just for Fun. Mrs. Wimsett and Mr. Bastian were with her. They walked through a dark hallway on an agitated floor, met with other unusual happenings while there, and finally

came to the top end of a wide, inclined, moving canvas belt. The witnesses give the height of the upper end of this belt at from 10 to 12 feet, its lower end 14 to 15 inches above a platform covered with matting, and its length from 28 to 30 feet. It is operated over rollers. It carries those who sit upon it at the top downward to the platform. Mrs Pflug and her two friends got upon this belt, sitting abreast, Mr. Bastian being in the center. Immediately after reaching the platform it was found that Mrs. Pflug's right leg had been injured, consisting of oblique fractures of the lower ends of the tibia and fibula. She brought this action and recovered damages for the injury. The ground of liability charged is this:

"That the said amusement device was inefficiently and negligently operated on the said 5th day of September, 1921, at 11:30 p. m. in that, the usual number of guards were not stationed at the bottom of the chute to catch the patrons as they reached the bottom, so as a result thereof, the feet of the plaintiff shot out from under the plaintiff and she was hurled with such violence to the floor that she broke her right leg and suffered the injuries hereinafter set forth. * * * That the said negligence of the defendant and the resulting dangerous condition of the device was caused by the fact that there were more passengers at that particular moment than there were guards to catch them, namely, that while the other woman passenger was assisted by a guard, there was no guard stationed there at that particular time to assist and catch the plaintiff, by reason of which negligence, in permitting and inviting the plaintiff to ride or enter the said amusement device without providing a guard to catch her, the plaintiff, by the momentum of her body descending from the height and slope of the slide, was in nowise assisted, and the plaintiff was hurled violently to the floor, suffering the injuries set forth."

Persons who came down on this belt, including Mrs. Pflug and her two friends, were instructed to sit in an upright position. As one's feet touched the platform he usually stood upright and stepped aside. That seemed to be the natural thing to do. The moving belt was an apparent aid in rising. The device was much like slides for children in public parks and school yards. There is no evidence in the record that Mrs. Pflug was hurled violently to the floor, other than the fact that she came down on the belt to the platform. The belt was kept moving at an approximately uni-

form late of speed. Mrs. Pflug is a school teacher, 35 years of age, and must have quickly and fully seen and understood the situation. She describes how the injury occurred thus:

"When we came to the level of the street, the canvas came to the level of the street and it was about 14 inches, 15 from the street, and I went 'off the end and struck my foot on the walk and broke the ankle. * * * When I came to the end of the belt I didn't bend my knees, no notice telling me to; came down with such swiftness I just slid on and landed in this position, both feet out and rested on this elbow."

There can be no doubt that she landed on the platform. It could not be otherwise. The guard, standing on one side at the foot of the belt, testified that as she came down she was leaning on the left side somewhat and that she landed off sidewise. Mr. Bastian did not testify. Mrs. Wimsett's testimony is more general than that of Mrs. Pflug as to how the injury occurred. She said that she noticed the position of plaintiff when she landed, and that her legs were straight out with the injured foot turned over slightly. As the three came down the guard stood on the side on which Mrs. Wimsett sat, and he testified that as she reached the platform and almost got to her feet he took hold of her hand and assisted her. Mrs. Wimsett said that the guard caught her at the bottom, took hold of her arm and placed her on her feet. We think it evident that the injury did not occur while Mrs. Pflug was endeavoring to rise to her feet after she found herself prone upon the platform, but that it occurred, as she says, when her foot struck the (platform) walk; and that she landed in the way she did because she kept her legs straight out and rigid. She did not bend her knees when she reached the end of the belt, thus permitting both feet to come upon the platform, and thereupon attempt to stand. That would seem to be a precautionary act that every one would take under the circumstances without being told to do so.

It was further charged in the complaint that customarily the defendant had two guards instead of one, as on this occasion, and when it had only one guard present it would let only one person come down at one time. There was only one guard present on this occasion, but no one testified that it had ever been the custom or practice to permit only one person to come down on the belt when only one guard was present. Mrs. Richards, who was one of the party, was standing on the opposite side of the

street or road from the platform, and she testified that she went to Mrs. Pflug while she was still on the platform and that the guard said: "Unfortunately there was but one guard here and usually there are two." The guard denied that he made the statement. Mrs. Richards further testified that she had come down on this belt several times on other occasions and that on those occasions there were attendants on each side to catch passengers, and that she was always caught as she came down. This was also denied by the guard and others, except that all testified that on Children's Days there were two guards, but that their duties were not to catch the children who came down but to keep the platform clear after they had reached it. Mr. Moore, assistant general manager of plaintiff in error, testified that about 60,000 patrons had come down the belt that season, of whom 20,000 were children, and that this was the only accident that had occurred, that there was only one guard during the season at the foot of the belt, except on Children's Days.

Fred Knoch, the guard throughout the season, who was present as such on this occasion, testified that he was the only one stationed there as guard at any time except on Children's Days, that no assistance was rendered by him until the patron's feet touched the floor, that most of the people came right off the belt on their feet, that his duty was more to keep people away, he had to move them back, they would stand up and watch the rest coming down. Mr. Friederich, general manager for plaintiff in error and also for the company that owned and operated this amusement, testified that there was never but one attendant stationed at the foot of the belt except on Children's Days, and that that was for the purpose of avoiding congestion. It was his duty to engage and discharge employés for both companies. The testimony is convincing that the only service performed by the guard in the respects here contended for was to assist old ladies or stout ladies, or those who might appear to lose their balance when they reached the platform. That was the assistance rendered to Mrs. Wimsett, and was doubtless the assistance rendered to Mrs. Richards on former occasions. She does not explain what she means by saying that she was caught on former occasions. It cannot be believed from the record that any one was caught on the belt before she had reached the platform. No inference can be drawn from the facts that a guard did or could prevent a patron's feet from coming on to the platform under the weight

and momentum of the body, without putting his arms around the patron before that point was reached. The purpose of having the lower end of the belt fourteen inches above the platform was to afford the patron an obvious opportunity to land on his feet and stand up. Mrs. Pflug neglected to do this and this was some evidence that she failed to exercise ordinary care for her own safety. She did not bend her knees and put her feet on the platform when she reached the end of the belt, but kept her legs extended, went off the belt in that position, carrying down the weight of her body on one foot as it reached the platform; for she says she "landed in this position, both feet out and rested on this elbow." We think it clear from the facts in the case that the injury occurred in the manner that has been stated; and that for two reasons the jury should have been instructed to find a verdict for the defendant, as requested.

[1] 1. Mrs. Richards' testimony about two guards is of but slight if any weight. The preponderance is too heavily against her. The three witnesses for the company who testified on that subject were in a much better position to know the true facts than she. They must have known. One of them was the guard who had been there throughout the season, the other was the president and general manager, whose duty it was to employ and discharge employés for both companies, and the other, assistant general manager, whose duties also acquainted him with the true facts on that question. The evidence was well-nigh conclusive that there was only one guard, except on Children's Days, so much so that the verdict ought not to stand if that was the turning point. Fricke v. Harvester Co., 247 F. 869, 160 C. C. A. 91. But conceding, as argued, that the true facts in that regard made an issue for the jury, we think the negligence charged was not the proximate cause of the injury. As explained above, any number of guards, if they had been present, would not have attempted to extend assistance to Mrs. Pflug until after she had reached the platform. There was no occasion to do so. In the nature of things they could not have appropriately done so.

[2] 2. Even if the jury accepted the testimony of Mrs. Richards as to the two guards being present on the few occasions on which she had come down the belt, there is no proof on which the jury could find that two guards were present on any other days except Children's Days. Sixty thousand patrons had been over this belt that season and this was the only accident. Under those facts the injury to Mrs. Pflug, or a like injury to some other person, could not have been foreseen nor reasonably anticipated as the probable result of the negligence relied upon. No such thing had ever happened before. Past history and experience would not have suggested to prudent men that it would happen, but on the contrary that experience, if suggestive at all, would be indicative that it would not and could not happen, and the defendant was not under a duty to guard against what did happen. Railroad Co. v. Elliott, 55 F. 949, 5 C. C. A. 347, 20 L. R. A. 582; Commonwealth Steel Co. v. McCash, 184 F. 882, 107 C. C. A. 206; Great Northern Railway Co. v. Johnson, 207 F. 521, 125 C. C. A. 183; Motey v. Pickle Marble & Granite Co., 74 F. 155, 20 C. C. A. 366; The Paunpeck, 86 F. 924, 926, 30 C. C. A. 494; Crane Co. v. Busdieker, 255 F. 664. The principle is stated by Peckham, Judge, for the Court of Appeals of New York, in Hubbell v. Yonkers, 104 N. Y. 434, 10 N. E. 858, 53 Am. Rep. 522, thus:

"That which never happened before, and which in its character is such as not to naturally occur to prudent men, to guard against its happening at all, cannot, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening and guarding against that remote contingency."

When the evidence was all in a duty rested upon the court to say whether any facts had been established by sufficient evidence from which the negligence charged could be reasonably and legitimately inferred; and the requested instruction required the court to exercise that duty. Randall v. R. R. Co., 109 U. S. 478, 3 S. Ct. 322, 27 L. Ed. 1003. The court denied the request, and in doing so we think it erred. It should have been granted.

Other questions have been presented in briefs and touched upon in argument, but the view we take of the case renders their consideration unnecessary.

Reversed and remanded.