## W. J. FOYE LUMBER CO. v. PENNSYLVANIA R. CO.

(Circuit Court of Appeals, Eighth Circuit. December 17, 1925. Rehearing Denied March 5, 1926.)

No. 6883.

**1. Trial ⬯141, 143—When trial court has duty to direct verdict at close of trial stated.**

It is duty of trial court to direct a verdict at close of trial, when evidence is undisputed, and when evidence is conflicting, but of so conclusive a character that court, in exercise of sound judicial discretion, would set aside verdict in opposition to it.

**2. Appeal and error ⬯997(3)—Appellate court may not lawfully reverse judgment directed by trial court on conflicting evidence, unless it is convinced that evidence was not so conclusive that opposite verdict could not have been sustained.**

Appellate court may not lawfully reverse judgment directed by trial court, where evidence was conflicting, unless from consideration of evidence it is convinced that it was not of such conclusive character that court below, in exercise of sound judicial discretion, would not have sustained verdict in opposite direction.

**3. Sales ⬯52(2)—Fact that parties would not be apt to make contract contended should be taken in consideration.**

As respects seller's claim of contract right to recover difference in freight on ties which were guaranteed not to run over 3,300 pounds per 1,000 feet, and which ran much less, fact that parties would not be apt to make such contract should be taken in consideration.

**4. Contracts ⬯154—Rational and probable meaning of contract preferred to unfair, unreasonable, and improbable meaning.**

In determination of extent and meaning of a contract, that result which makes it a rational and probable agreement must be preferred to that which makes it an unfair, unreasonable, or improbable one.

**5. Sales ⬯53(1)—Evidence held insufficient to make it a jury question whether there was agreement regarding guaranty as to weight of ties, with understanding for refunds for underweight.**

Evidence held insufficient to take to jury question whether there was understanding between railroad company and lumber company that railroad company would pay all difference in freight charges due to less weight per 1,000 feet than that guaranteed by lumber company, in view of Cobbey's Ann. St. Neb. 1909, § 6028.

Kenyon, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action by the W. J. Foye Lumber Company against the Pennsylvania Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Raymond G. Young, of Omaha, Neb. (Mathew A. Hall, of Omaha, Neb., on the brief), for plaintiff in error.

William M. Giller, of Omaha, Neb. (Frank L. Weaver, of Omaha, Neb., on the brief), for defendant in error.

Before SANBORN and KENYON, Circuit Judges, and SCOTT, District Judge.

SANBORN, Circuit Judge. W. J. Foye Lumber Company, the plaintiff below, a corporation, was a jobber and broker of timber ties and lumber at Omaha, Neb. In April and May, 1920, the Pennsylvania Railroad Company bought from it 200,000 ties, estimated to weight 3,300 pounds per 1,000 feet, which the plaintiff purchased from mills in the Pacific Northwest and caused to be delivered to the defendant f. o. b. cars at the mills, and the defendant paid the freight charges upon them from the mills to their destinations on the Pennsylvania railroads at Chicago and one or two other points. These cars were sent from the mills on the orders of the plaintiff to their destinations, specified by the

defendant. The defendant claimed that the agreed purchase price of these ties was $32.50 per 1,000 feet f. o. b. cars at the mills. The plaintiff delivered the ties, the defendant received them and paid or satisfied the plaintiff that it would pay this $32.50 per 1,000 feet therefor. The plaintiff claims that the agreed purchase price was $32.50 per 1,000 feet plus the difference between the amount of the freight charges on 200,000 ties weighing 3,300 pounds per 1,000 feet from the mills to the destinations of the ties shipped and the actual freight charges on the ties actually shipped which, on account of their lighter weight, amounted to $15,055.15 less than those charges would have been if the ties purchased and shipped had weighed the 3,300 pounds per 1,000 feet. For convenience this difference in freight charges will be called "underweight," and the difference between the amount of the freight charges if the ties had weighed 3,300 pounds per 1,000 feet, and the freight charges for their transportation if they had weighed more than 3,300 pounds per 1,000 feet will be called "overweight."

Because the railway company refused to pay this additional $15,055.15 underweight the plaintiff brought this action. It was tried before the court below and a jury, and at the close of the trial the court instructed the jury to return a verdict for the defendant. That ruling and many others have been assigned as error and exhaustively briefed and discussed, but the answer to a single question will unavoidably dispose of this case in this court. That question is: Was the evidence in this case such that, if the court had submitted the question to the jury whether or not the railroad company agreed to pay this $15,055.15 underweight as a part of the purchase price of these ties, and the jury had found that it did so agree, the court would not, in the fair exercise of its judicial discretion, have sustained that verdict?

These are established rules by which the consideration and decision of the question of the legality of the court's direction to the jury to find a verdict for the defendant must be tested and decided:

[1, 2] It is the duty of the trial court to direct a verdict at the close of the trial in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but of so conclusive a character that the court, in the exercise of a sound judicial discretion, would set aside a verdict in opposition to it. And when the trial court has directed a verdict

upon the latter ground, the appellate court may not lawfully reverse the judgment founded upon it, unless upon a consideration of the evidence it is convinced that it was not of such a conclusive character that the court below, in the exercise of a sound judicial discretion, should not have sustained a verdict in the opposite direction. Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 660, 21 S. Ct. 275, 45 L. Ed. 361; Randall v. Baltimore & Ohio R. R. Co., 109 U. S. 478, 481, 482, 3 S. Ct. 322, 27 L. Ed. 1003; Agricultural Ins. Co. v. Higginbotham (C. C. A.) 274 F. 316, 318; Holland et al. v. Director General of Railroads (C. C. A.) 273 F. 928, 929; Fricke v. International Harvester Co., 247 F. 869, 871, 160 C. C. A. 91; Missouri Pacific Ry. Co. v. Oleson, 213 F. 329, 330, 130 C. C. A. 31; Canadian Northern Ry. Co. v. Senske, 201 F. 637, 645, 120 C. C. A. 65.

We turn to the evidence in the record. These facts were admitted or conclusively proved: The plaintiff sold the ties in question to the defendant, they were delivered, received, and the defendant paid or will pay $32.50 per 1,000 feet for them f. o. b. cars at the mills and the freight charges for their transportation thence to their destinations. The plaintiff bought the ties of the mills at prices agreed upon between it and the mills, which differed from the price agreed upon between the plaintiff and the defendant, for the sale thereof by the former to the latter, and the defendant was not a party to or in any way bound to the mills or the plaintiff by reason of the contract of sale or the transaction between the mills and the plaintiff.

[3, 4] The plaintiff claims that it guaranteed to the defendant that the weight of the ties should be 3,300 pounds per 1,000 feet and agreed to pay to the defendant any overweights, and that the defendant agreed to pay to the plaintiff any underweights. As the plaintiff was to buy, furnish, and deliver the ties, and could select ties lighter or heavier than the 3,300 pounds per 1,000 feet, this was not a contract that would be very likely to appeal strongly to a business man, a purchaser either for himself or for a railroad company, nor was it one that a purchaser would probably make. Such a proposed purchaser would be likely to foresee a probable excess of underweights if he entered into such a contract, though perhaps not to the extent of $15,055.15; nor is it very clear how the plaintiff, if such a contract were made, could select and furnish under it ties weighing so much less than the weight it had guaranteed as to cause underweights and a loss

to the defendant of $15,055.15, without action, rather inconsistent, to say the least, with its guaranty. These considerations are not unworthy of notice, in view of the familiar rule that in the determination of the extent and the meaning of a contract that result which makes it a rational and probable agreement must be preferred to that which makes it an unfair, unusual, or improbable one. Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota, 121 F. 609, 611, 57 C. C. A. 635; American Bonding Co. v. Pueblo Investment Co., 150 F. 17, 28, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357.

The transaction between the plaintiff and defendant was conducted by W. J. Foye of Omaha, on behalf of the plaintiff, and by I. B. Thomas, purchasing agent, and C. W. Clewell, lumber agent, of the defendant at Chicago. On April 6, 1920, Mr. Foye met Mr. Thomas and Mr. Clewell for the first time at the office of Mr. Thomas in Chicago. Mr. Thomas told him that they wanted ties, and wanted them quick, and asked him how fast he could furnish them and the price. Mr. Foye answered that he could get them 20 M by May 15th, and 50 M every 30 days thereafter, and that he could furnish ties weighing 3,300 pounds per 1,000 feet for $2.36 per standard tie, and $2.19 for the next size below, delivered at Chicago, or at $32.50 per 1,000 feet delivered f. o. b. cars at the mills. They verbally agreed that the railroad company would pay 85 per cent. of the price on receipt of the bills and bills of lading, and the balance, or 15 per cent., upon the arrival of the ties at Chicago, or their other final destination. Mr. Thomas then said, "Now, you go ahead and get those out as fast as you can, and we will write you a letter." There is no controversy thus far. But Mr. Foye testified that at this meeting he explained to Mr. Thomas what was meant by guaranteed weights and overweights; that Mr. Thomas asked him if the price was on the basis of 3,300 pounds to the 1,000 feet and he answered, "Yes;" that Mr. Thomas then said, "What if they weigh more?" He said, "3,300 pounds is guaranteed, and is the association standard weight; the Western Railway Weighing Association recognizes that as the weight on fir ties or timber. They will protect that, and, if any expense bill is furnished showing more than that, they will protect that weight, with the understanding, when getting those ties for you at $32.50 at the mill, this weight is guaranteed; if any of those shipments overweigh, you charge that back, and if any of those shipments under-

weigh, there is a credit. The mills get that. We don't get anything at all of that."

But, if Mr. Foye made that statement to Mr. Thomas and Mr. Clewell, it failed utterly, in our opinion, to give notice to either of them that the plaintiff would guarantee the weight, or that the defendant would be expected to or did agree to pay the underweights. In view of the fact that there were here two contracts independent of each other, one between the plaintiff, the purchaser from the mills, and the mills, and the other between the plaintiff, the seller, and the railroad company, the purchaser, and Mr. Foye was speaking for the Foye Company, the statements in it that "they will protect that weight," that "when getting those ties for you at $32.50 at the mill, this weight is guaranteed," that "if any of those shipments underweigh, there is a credit; the mills get that; we don't get anything at all of that," those statements seem to indicate that this matter of guaranty appertained to the contract between the plaintiff and the mills, and not to the contract between the plaintiff and the defendant. If the mills guaranteed weights to the purchasers from them, the defendant was not a purchaser from them, and there certainly could be no presumption that all who subsequently purchased ties from buyers from the mills secured from such buyers guaranties of the weights, or made contracts to pay underweights as a part of the purchase price, unless they plainly agreed so to do.

Moreover, Mr. Foye testified that at this conversation Mr. Clewell was at his desk, probably seven or eight feet from Mr. Thomas' desk, and about three feet from where Mr. Foye was sitting. Mr. Thomas died before this action was commenced, and we have not the benefit of his testimony. But Mr. Clewell testified that he was present during this entire conversation on April 6th, and that nothing was said in that conversation about the weight of 3,300 pounds being guaranteed, and the railroad company paying or refunding underweights and receiving overweights; that at that meeting he dictated in the presence of Mr. Thomas and Mr. Foye a memorandum of the arrangement made between them, which was introduced in evidence, and which sets out the number of the ties to be bought, the description of them, the price "$32.50 per M," the time when the ties were to be delivered, and the terms of payment therefor, but which contains no statement of or reference to any guaranty of weight, or the payment of any underweight or overweight by either of the parties. The

next day, April 7, 1920, the plaintiff sent a letter to the defendant, wherein it stated that, confirming its arrangement of April 6, 1920, it was entering the defendant's order for 200,-000 ties, clearly described the sizes and character of these ties, specified the price to be $2.36 per piece for one size, and $2.19 per piece for the other, stated that they were to be delivered f. o. b. cars Chicago, that 85 per cent. of the price of each shipment was to be paid at the time of the receipt by the defendant of the invoices, and the other 15 per cent. upon delivery and inspection of the ties, but contained no statement or reference to any agreement about guaranty of weights or payment or receipt of underweights or overweights.

[5] Because the explanation of underweights and overweights and guaranty to which Mr. Foye testified gave no clear or fair notice to the defendant that the plaintiff claimed that the defendant was to pay underweights, but more clearly indicated that the matter of guaranty and underweights and overweights pertained to the contract between the mills and the plaintiff, and not to any agreement between the plaintiff and the defendant, because the parties to this action knew that no valid contract without writing, subscribed by the parties to be charged, could be made by this conversation, and that they clearly intended to put their contract in writing, because the testimony of Mr. Clewell that no statement about underweights or overweights or guaranty was made at the conversation is more likely to be correct than that of Mr. Foye, and because neither the subsequent writings, the letter of the plaintiff of April 7th, nor the letter of the defendant of April 15, 1920, accepting the proposal in the letter of April 7, 1920, contains any reference to this claimed agreement of guaranty and payment of underweights, but the first clearly states the price to be $2.-36 per tie for one size, and $2.19 per tie for the other size, and the acceptance of April 15, 1920, clearly states the price to be "$32.50 per M," and nothing more, we are of the opinion that, in the exercise of a just judicial discretion, no court could sustain a finding by a jury, or could lawfully find itself, that there was any agreement or understanding regarding guaranty, overweights, or underweights established by this testimony of Mr. Foye, and that it must be disregarded.

On April 15, 1920, the defendant wrote to the plaintiff that it accepted the latter's proposal of April 7th, and in that acceptance, after describing the grades and character of the ties, stated: "Quantity: 200,000. Price: $32.50 per M. F. o. b. point: Cars. * * * Shipments to begin between April 15th and May 15th"—and repeated the same terms of payment stated in the plaintiff's letter of April 7th; the price of $2.36 per tie for the larger and $2.19 per tie for the smaller sized ties, f. o. b. cars Chicago, specified in the plaintiff's letter of April 7, 1920, and the price of "$32.50 per M; f. o. b. point, cars," specified in the defendant's acceptance, which were equivalents, and, in the conversation of April 6, 1920, Mr. Foye had offered the defendant its choice of these prices, so that when this acceptance of April 15th was received by the plaintiff, it and the defendant had subscribed and delivered writings to each other, each of which stated the same character of ties, the same number of ties, the same time of shipments or delivery, equivalent prices, and the same terms of payment, and none of these writings contained any reference to any guaranty of weights, or any agreement to pay underweights or overweights.

After receiving this acceptance of the defendant of April 15th, the plaintiff wrote the defendant on April 20th that its acceptance did not check in all details with the arrangement which was outlined in the letter of April 7th, that Mr. Foye was down South, and suggested that he would stop at Chicago to straighten out details. The remaining writings between the parties to this action pertinent to the question whether or not the defendant ever intended to agree or did agree with plaintiff to pay underweights as a part of the price of these ties are these:

On May 3, 1920, the plaintiff wrote to the defendant that upon checking up the contracts between the plaintiff and the mills for shipping the 200,000 ties it found that those contracts read "for price f. o. b. cars mill, with a guaranteed weight of 3,300 pounds per 1,000 feet, and any underweight below this is to be allowed the mill"; and the plaintiff further wrote to the defendant in that letter, "All of this is to be delivered on a Chicago freight rate basis, therefore, our invoices to you will be on this basis and $32.50 f. o. b. cars shipping point, in line with your letter of April 15th." On May 11th plaintiff wrote to the defendant that, in line with long-distance telephone with Mr. Clewell, it was discontinuing its efforts to secure fir ties in heart grade and would go ahead completing arrangements for shipping the defendant's entire order of 200,000 No. 1 common, basis association grading rules. Mr. Foye

testified that on May 11th he had two long-distance telephone conversations with Mr. Clewell, in one of which the latter instructed him not to try any further to secure ties on the basis of "heart" specifications, but to go ahead and ship the 200,000 No. 1 common fir, and he agreed to do so, and in the other conversation Mr. Clewell directed him to ship 20,000 of the ties to the defendant's storekeeper at Ft. Wayne. There was no testimony that anything was said in either of these conversations about the guaranty of weights, or about any agreement to pay underweights, or to change the purchase price of the 200,000 ties.

On May 12th the defendant wrote the plaintiff that its letter of May 3d advised it that the fir ties would "be shipped with a guaranteed weight of 3,300 pounds per 1,000 feet, and any underweight below this is to be allowed the mill. It is not quite clear to us what you mean by underweight, after guaranteeing the weight of 3,300 pounds per 1,-000. Will you kindly advise further." On May 14th the plaintiff in answer wrote that: "When guaranteeing a certain weight on lumber, the consignee is protected against any overweights on shipments. Should there be any underweights on the shipments, the mill gets the benefit of the same. This protects both the shipper and the consignee. It is quite usual for shipments weighing either under or over the estimated or standard weights, and it is the custom on which all fir mills insist of guaranteeing weights and to protect the consignee, and thereby give the mills benefit of any underweights. It is simply a give and take proposition, which protects both." On May 17, 1920, the plaintiff wrote to the defendant that it had not yet received its formal shipping instructions on the 200,000 fir ties, and was anxious to have them, so that shipments could be made direct to the destinations, without the necessity of delivering any shipments in transit. On May 20, 1920, the defendant sent to W. J. Foye Lumber Company a written order to furnish "200,000 cross-ties," accurately described, "price to be $32.50 M f. o. b. mill; inspection to be made at destination," and specified the places to which the cars were to be assigned. On May 22, 1920, the plaintiff wrote and sent to the defendant this answer: "We have your formal order N–3588–50, dated 20th, covering 200,000 fir ties, and this will complete the formal records covering entering of this order." Neither of these two last letters contained any agreement about or reference to any guaranty of weights, or any payment of overweights or underweights, and under

them the ties were furnished and delivered by the plaintiff to the defendant, who paid the $32.50 per 1,000 feet therefor.

So it is that a careful review of all the pertinent writings passing between the parties to this action from the commencement of their negotiation of the sale of these 200,000 ties on April 6, 1920, to its close on May 22, 1920, discloses the fact that in each one of them in which the purchase price is stated, except in the plaintiff's letter of May 3, 1920, in which for the first time it sought to add to the purchase price the underweights, in the defendant's answer on May 12, 1920, to that letter, inquiring the meaning of it, and in the plaintiff's reply of May 14, 1920, to that query, the purchase price of these ties was stated to be $32.50 per 1,000 feet f. o. b. mills, or its equivalent, and in not one of them was there any statement or agreement about guaranteeing the weight of the ties or the payment of underweights. This is true of the memorandum of the first conversation of April 6, 1920, dictated in the presence of Mr. Foye, Mr. Thomas, and Mr. Clewell, of the plaintiff's written offer of the next day, April 7, 1920, based on that conversation, of the defendant's acceptance of that offer, dated April 15, 1920, and of the final written order of the defendant for the 200,000 ties, which expressly stated the price to be "$32.50 M f. o. b. mill," and which was dated only six days later than the date May 14, 1920, of the plaintiff's explanation of the guaranty of weights, underweights, and overweights, and which order was on May 22, 1920, expressly acknowledged by the plaintiff without exception, objection, or modification, and under which the defendant received and paid for the ties.

The exhaustive brief and learned argument of counsel for the plaintiff has received study and meditation, but in view of the evident intention and studious care of the parties to this transaction to put the terms of their agreement in writing, and of their failure to put into any of these writings a plain stipulation "subscribed by the party to be charged" (2 Cobbey's Annotated Statutes of Nebraska, § 6028), the defendant, that it would pay these underweights as a part of the purchase price of the ties in addition to the price so often and expressly stated in the writings, it is difficult to believe that the defendant ever agreed or ever intended to agree to pay them.

Counsel for the plaintiff argue that when the defendant on May 11, 1920, telephoned to the plaintiff not to try any farther to secure

heart grade ties and to go ahead and ship the 200,000 No. 1 common fir ties and instructed the plaintiff to ship 20,000 of them to Ft. Wayne, the defendant by that action closed the contract, which it was estopped from denying, to pay the underweights which the plaintiff had sought to add to the agreed purchase price by its letter of May 3, 1920. But there was nothing new in this direction to go ahead and ship the 200,000 ties. The defendant from the commencement of the negotiations was in haste to get them. In the first conversation on April 6, 1920, Mr. Thomas had told Mr. Foye to go ahead and get 200,-000 ties· "as quickly as you can," and from that time on the defendant was anxious, and was urging the plaintiff to get them onto its railroads, and Mr. Foye was trying to comply with its request. In that conversation Mr. Foye said he could get 20,000 ties by May 15th. Nor was there, in our opinion, any estoppel of the defendant on May 11, 1920, or thereafter, from denying any agreement on its part to pay the underweights which plaintiff sought to add to the purchase price by its letter of May 3, 1920. The purchase price of the ties had been agreed upon ·verbally on April 6, 1920; the plaintiff in its letter of April 7, 1920, stated that price, or its equivalent, long before the letter of May 3, 1920, was written. The plaintiff could not bind the defendant to an addition of $15,055.-15 to that agreed price by its letter of May 3, 1920, in view of the fact that the defendant's order for the ties of May 20, 1920, was at the price theretofore agreed upon in writing, and that price was expressly stated in the order, and the plaintiff in writing acknowledged the receipt thereof, and neither then nor thereafter, until all or nearly all the ties had been delivered under it, made any objection or exception to it.

Plaintiff's counsel contend that the defendant knew and understood, during the furnishing and delivery of the ties, that the plaintiff was delivering them in the belief that the defendant had agreed to pay the underweights. We have read more than once all the evidence in this case, and in our opinion it does not establish that contention, and would not have sustained a verdict of a jury to that effect.

The result is that a consideration of all the evidence in this case, and of all the arguments and briefs of counsel, has convinced that, if the issue in this case had been submitted to a jury, and that jury had rendered a verdict for the plaintiff, the trial court in the exercise of a sound judicial discretion would not have been justified in sustaining that verdict.

The judgment below must accordingly be affirmed; and it is so ordered.

.KENYON, Circuit Judge .(dissenting). I am unable to concur in the opinion of the majority. It seems to me there are questions of fact involved which should be settled by a jury. One of these is whether or not defendant in error is bound by plaintiff in error's understanding and construction of the agreement, and is estopped to deny liability for underweights. From August 25, 1920, the date of the receipt of a certain letter written by plaintiff in error to Mr. Thomas, purchasing agent of defendant in error, defendant knew that it was plaintiff's understanding of the contract that the guaranteed weight and underweight features were part thereof, and that plaintiff in error expected defendant in error to pay underweights and itself to pay overweights on the shipments of ties. Approximately 27 per cent. of the ties sold had been received by defendant in error at the time of the receipt of this letter. The situation, it seems to me, is therefore presented of defendant in error, when it had received approximately 27 per cent. of the ties it had purchased, being informed of plaintiff in error's understanding of the contract, and with such information it uttered no word of protest—it made no suggestion to plaintiff in error to correct the misconstruction of the contract from its viewpoint, but permitted plaintiff in error to go ahead and carry out the contract according to its understanding, and defendant in error received approximately 73 per cent. of the ties, knowing that plaintiff in error expected to be paid according to its idea of the contract, viz. that defendant in error had agreed to pay the underweights.

I cannot escape the conclusion that, when the letter referred to of August 24, 1920, was received by defendant in error, it was its duty to speak out, or in some way indicate its nonconcurrence therewith. If it was not willing to accept the ties, knowing plaintiff in error's expectation that defendant in error would pay the underweights, it was its duty to say so. Silence when one should speak, and acquiescence when one should object, may be sufficient to establish estoppel. I think there are questions of fact, also, with reference to the alleged contract, which were for the jury, but I forego discussion thereof. I rest my dissent principally upon the proposition that there was evidence from which a jury would have been justified in

finding an estoppel as to defendant in error, and that this question should have been submitted to the jury.