### GRINNELL CO., Inc., v. MILLER et al.

#### No. 8694.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 12, 1945.

Decided June 27, 1945.

Benjamin P. DeWitt, of South Orange, N. J. (Sidney Pepper, of New York City, on the brief), for appellant.

John E. Toolan, of Perth Amboy, N. J. (Smathers, Scott & Munyan, by Thomas H. Munyan, all of Atlantic City, N. J., on the brief), for appellees.

Before GOODRICH and McALLISTER, Circuit Judges, and GIBSON, District Judge.

McALLISTER, Circuit Judge.

Grinnell Company, Inc., brought suit against Anthony P. Miller, Inc., a building firm, and Miller, its President, appellees herein, for a balance due on an account for certain plumbing materials, ordered from the Grinnell Company by Harry Hurowitz, a sub-contractor, and furnished to a job on which the Miller Company was general contractor.

Appellant based its claim against Miller and the Miller Company on the following grounds: (1) That they signed a written contract agreeing to pay Grinnell for the plumbing materials; (2) that Hurowitz was the agent for the Miller Company in the purchase of the materials, and, therefore, the Miller Company was bound on the obligation incurred by him; (3) that Miller agreed to sign a contract, on behalf of the Miller Company, to pay Grinnell for all the material furnished to Hurowitz on the job, provided a surety on a performance bond would consent to such agreement; that the surety did consent to such agreement, and, that although the Miller Company did not sign the contract, nevertheless, it was bound to pay the account because the material was furnished in reliance upon the prior agreement that it would sign the contract if the surety consented; (4) that there was an oral promise on the part of Miller, acting for the Miller Company, to pay the Grinnell account, prior to the time the material was furnished on the job, and that the Grinnell Company furnished such material relying upon such oral promise.

Appellees denied that they signed a written contract; that Hurowitz was the agent of the Miller Company; that the surety ever consented to Miller's agreement to pay Grinnell for the plumbing material; and they further denied making any oral prom-

ise to pay Grinnell for the Hurowitz account.

On trial before a jury, the district court directed a verdict of no cause of action in favor of Miller and the Miller Company on the ground that a verdict for plaintiff based upon the testimony of plaintiff's witnesses would have to be set aside as being against the weight of the evidence.

In order to ascertain whether the court was justified in directing a verdict in favor of the defendants, it is necessary to review in some detail the testimony and the circumstances surrounding the transactions of the parties, for this is, essentially, a fact case.

On March 21, 1939, the Miller Company entered into a contract to erect an apartment house for the Ogontz Housing Corporation in Philadelphia. Bids on subcontracts were advertised for, and, from a number of competitors, Hurowitz was awarded the plumbing and heating contract on a bid of $93,000, subject to his furnishing a bond to guarantee performance. This bond, on which the Standard Surety & Casualty Company of New York was surety, was furnished to the Miller Company on May 17, 1939. On June 15, 1939, Hurowitz gave the order for the plumbing and heating materials to the Grinnell Company, at a price of $50,000.

An important part of appellant's case is based upon alleged statements made by Miller to the representatives ·of the Grinnell Company, when the latter first started to supply material for the job.

Hepburn, the Grinnell salesman who had discussed the material order with Hurowitz, testified that he subsequently saw Miller and told him that he was sure that Grinnell would not trust Hurowitz to the extent of a $50,000 order, and that, in reply, Miller said: "You don't need to worry, Bill, I will see that you are paid, I will hold up money, I will see that you are paid by holding back the money that is going to him." Hepburn then added: "Now, he might not have said it in the exact words I am bringing out, * * *."

A few days after the negotiations between Hurowitz and Hepburn, the order for the material was referred to Rice, credit manager of the Grinnell Company, who, with Hepburn and Reiter, office manager of the Philadelphia branch of the company, interviewed Miller on June 21, 1939, and presented a written form of agreement, requesting its execution by Miller on behalf of the Miller Company. Under this proposed contract, Miller would have agreed to pay the Grinnell Company for all materials ordered by Hurowitz and specified for the job, not to exceed the sum of $50,000. In reply to the request to sign such a contract, Miller seems to have done about what any reasonable businessman, or contractor, who had a performance bond, would do. He approved the instrument conditionally, stating that the proposition seemed fair to him and that he would sign the agreement if it were approved by his attorney and by the company that was surety on the performance bond. Anything more than this, would obviously have been foolhardy, as Miller, by an absolute agreement to pay Grinnell for the material ordered by Hurowitz, might easily have lost all the protection he had secured under the surety bond.

However, Hepburn testified that at the time the foregoing request to sign the contract was made to Miller, he asked Miller "how long will it take for this to be settled," and stated: "In the meanwhile, Hurowitz is holding up the job wanting material. Now, what do you want us to do?"; and that Miller replied: "Give him whatever he wants, Bill * * * For heaven's sake, don't hold up the job, we can't afford to have any stoppage there; I will see that it is paid."

With respect to what took place on the same occasion, Reiter testified that Miller said he would sign the agreement if it were acceptable to the surety company, and that he also requested that if Grinnell received any orders from Hurowitz, the material should be furnished and Miller would pay for it. Rice's version was that Miller said he would sign the agreement if the surety company approved; and, as Rice recalled, Miller said he would pay for materials furnished by Grinnell "until he told us to stop."

The foregoing constitutes the whole of the testimony submitted on behalf of plaintiff, which is claimed to prove an oral agreement on the part of Miller and the Miller Company to pay for any or all the materials ordered by Hurowitz up to a total of $50,000. ·

The interview between Miller and the three representatives of the Grinnell Company above mentioned took place on June 21, 1939. On June 24, Miller wrote Grinnell and advised that the proposed form of agreement had been submitted to the surety

company for its approval. Nearly three weeks later, on July 14, Miller again wrote Grinnell advising that Hurowitz, the surety company, and the Miller Company were in the midst of negotiations in connection with the matter. But still there was no notification that the surety consented to have Miller sign the agreement to pay Grinnell for all of the material ordered by Hurowitz. As a matter of fact, no such agreement was—then or in the future—ever signed by Miller or the Miller Company.

On July 17, the surety company wrote Grinnell advising that Hurowitz was about to give the surety company joint control of the expenditure of all funds received by him under his contract with Miller, and stating that it presumed it would be satisfactory to Grinnell, on all future invoices, to accept payment, as Hurowitz received the funds in the ordinary progress of the work.

On July 18, 1939, Miller wrote the surety company expressing his belief that, if the surety company intended to secure an assignment from Hurowitz of all moneys payable to him on his contract, such a transaction "will compel the Grinnell Company to request assurance from you that their account will be paid."

However, Grinnell did not require assurance from the bonding company that the Grinnell account would be paid. Instead, on July 24, Grinnell wrote the surety, in reply to the latter's communication of July 17, referring to the advice that Hurowitz was about to give the surety joint control over expenditures, and stated that it was entirely satisfactory to Grinnell to have the surety make payments directly to Grinnell for the materials furnished to Hurowitz.

The surety then entered into an agreement with the Miller Company that the latter should assume the pay roll of the men working for Hurowitz, deducting such sums so paid out, from the amount due Hurowitz on his contract, and paying the balance over to the surety. Out of the money received by the surety, it paid Grinnell for materials from time to time. But toward the end of the job, it became evident that the pay roll expense had eaten up most of the money provided for the plumbing contract, and there remained insufficient funds due Hurowitz thereunder from Miller to pay Grinnell for the material it had supplied to Hurowitz. The latter was not financially responsible and Grinnell ended up, "holding the bag" for $29,564.79, for which it brought suit against Miller and the Miller Company.

After an examination of the record and a careful consideration of the arguments of counsel, it is our conclusion that if the case had been submitted to the jury and a verdict returned for plaintiff, the district court would have been obliged to set the verdict aside as being against the great and overwhelming weight of the evidence; and that there was, accordingly, no error in directing a verdict of no cause of action.

In arriving at this determination, we have considered not only the testimony but also the circumstances surrounding the transactions of the parties, the most salient of which we here proceed briefly to review.

We shall summarily dispose of plaintiff's first two grounds previously asserted—that appellees signed a written contract to pay Grinnell for the plumbing material; and that Hurowitz was the agent of the Miller Company in purchasing the material from Grinnell.

■ It should be remarked that plaintiff does not, in its briefs or argument before us, claim that Miller signed a written contract to pay Grinnell. It seems, however, that counsel for plaintiff, in his opening statement, stated that the plaintiff would prove that Miller's promise to pay was in writing. Moreover, Rison, the official of plaintiff company who supervised all credit matters, testified that he had thought, from what Rice, the credit manager, had told him, that Miller had actually executed the proposed agreement to pay Grinnell direct for the plumbing material; and that the material was being delivered to the job on the basis of such an executed agreement. Rison further testified that he did not realize there was any question about the matter until the very day he testified at the trial, when he learned the actual facts from listening to the testimony of other witnesses. These circumstances only give color to the background of the controversy. It is sufficient to say that there was no evidence that Miller, or the Miller Company, ever signed such an agreement. On the contrary, the evidence was undisputed that they did not.

■ With regard to plaintiff's contention that Hurowitz was the agent of the Miller Company, there is no evidence whatever to substantiate such claim. Hurowitz was awarded the contract by the Miller

Company as a result of his bid in competition with numerous other contractors on a publicly advertised solicitation for bids by the Miller Company. He furnished a surety who guaranteed performance of his contract to Miller. The argument of plaintiff on this point was wholly without merit.

We come, then, to appellant's next claim: that the Miller Company agreed to sign the proposed contract to pay Grinnell, provided the surety consented; that the surety did consent thereto, and that, since the material was delivered in reliance on such agreement by the Miller Company, it is as much bound to pay as though it had actually signed the agreement. In our consideration of this particular question, we are not concerned with anything more than whether the surety consented that Miller could sign the agreement; and in determining this issue, it is unnecessary to pass upon any legal proposition suggested in the foregoing argument. If the surety did not consent, appellant's entire contention on this phase of the case is washed out. We have concluded that the surety did not consent to the proposed agreement and that, therefore, no claim against appellees can be based upon the theory of appellant in this respect.

There is no dispute that when the representatives of Grinnell presented their proposed contract to Miller in which it was provided that the Miller Company would pay Grinnell direct for the material furnished to Hurowitz, Miller told them he would sign the contract, provided the surety company would agree to his doing so.

The evidence upon which Grinnell bases its claim that the surety company did give such consent to Miller is the following: When the surety company had arranged with Hurowitz that it was to have control over the expenditure of all checks received by him under his contract with Miller, it wrote the Grinnell Company, as we have already mentioned, on July 17, 1939, advising of this arrangement. In its letter, it stated that it had been informed that "from time to time Mr. Hurowitz has executed to you (Grinnell) partial assignments addressed to the General Contractor for materials already supplied * * *. Under separate letter, we are informing the General Contractor that it will be satisfactory with this office for him to accept and honor the assignments which have been executed by Mr. Hurowitz."

Appellant insists that the "partial assignments" executed by Hurowitz, mentioned in the surety's letter, referred to the written contract which, on June 21, 1939, had been presented to Miller by the three Grinnell representatives, providing for payment by Miller for the materials supplied to Hurowitz. It is true that the agreement was tripartite in form; that, among other things, it purported to be an assignment by Hurowitz to Grinnell of the moneys due from Miller; that it included a proposed agreement by Miller to pay Grinnell direct for the material; and that it was actually executed by Hurowitz, with blank spaces for execution by Grinnell and by Miller.

But was the surety, in its letter of July 17, approving the proposed agreement that Miller pay the Hurowitz account direct to Grinnell? Let us see what the surety and Miller were saying and doing and, pursuant to what understanding, they were proceeding with respect to the "assignments" mentioned in the surety's letter to Grinnell. For it is more important to ascertain what the understanding was between the surety and Miller than it is to find out what Grinnell may have thought the surety was referring to.

In its letter of July 17, it appears that Miller had made it plain to the surety that if it desired to secure an assignment of the funds due from Miller, it would be necessary to have the Grinnell account paid in full as of that date, before Miller would accept such an assignment. The surety company immediately agreed to this proposition. On the same day, July 17, on which it wrote Grinnell, approving payment by Miller of the partial assignments which it "had been informed that from time to time Mr. Hurowitz has executed to you (Grinnell)", the surety company wrote Miller. In this letter, the surety company enclosed a copy of the letter it had just sent to Grinnell, and also a form of assignment in blank to be executed by Hurowitz. This assignment was, in form, to the surety company. It contained a provision stating that *the surety understood that Miller had accepted assignments by Hurowitz to Grinnell* "for materials supplied to me (Hurowitz) and amounting to $————." In its letter to Miller enclosing this form of assignment, *the surety company also suggested that Miller take care of the Hurowitz pay roll* from time to time, but only on written evidence of consent by the surety

to such payments whenever they were made. There was nothing unusual about this suggestion, as up to this time, the Miller Company, under an arrangement with Hurowitz, had been taking care of the latter's pay roll, deducting sums so paid out from the amount due to Hurowitz.

As to the form of assignment enclosed in the letter to Miller, the surety stated that "we submit it to you *with the corrections so that there can be no misunderstanding and no assumption of liability by you.*" It further suggested that if it were acceptable, Hurowitz could execute it without further delay.

Upon receiving this letter and form of assignment, Miller immediately commenced to secure the necessary information looking to its execution by Hurowitz and its acceptance by the Miller Company. He called Grinnell by telephone to find out how much material had been supplied to Hurowitz up to that date, and was told that the balance then due was $1,410.76. He did not fill in the blank to indicate that Hurowitz had made assignments to Grinnell in this amount, but redrafted the form of assignment which had been sent to him by the surety. In the redraft, it was set forth, in almost the same language as the suggested form of assignment, that the Miller Company had accepted assignments *which had been made by Hurowitz to the Grinnell Company* in the above stated amount of $1,410.76. Then there was added a provision, in accordance with the suggestion contained in the surety's letter, stipulating for Miller's advancing the pay roll for the payment of the workers employed by Hurowitz, with the right of Miller to deduct such sums from the amounts that otherwise might be due to the latter, as provided by the contract between them.

All of this was pursuant to Miller's prior notice to the surety that, before he would accept an assignment from Hurowitz to the surety, the Grinnell account would have to be settled in full.

After redrafting the assignment, Miller then had Hurowitz sign a letter, dated July 20, 1939, directed to the Miller Company authorizing and directing it "to pay to the Grinnell Company Inc., the sum of $1,410.76, for materials furnished me, by the Grinnell Company, Inc., to and including July 19, 1939, on the Ogontz Manor Apartment Job, Philadelpha, Pa." The letter signed by Hurowitz also directed how and when the payments aggregating $1,410.76 were to be made to Grinnell.

Miller then called the surety company by telephone advising of the changes made in the proposed assignment, and, pursuant to such telephone conversation, had Hurowitz execute the assignment, while he, himself, also signed the acceptance thereof on behalf of the Miller Company. He then sent a copy of the assignment, executed by Hurowitz and accepted by the Miller Company, to the surety company with a letter fully explaining the changes.

All these transactions—Miller's telephone call to Grinnell to ascertain the balance owing by Hurowitz, the preparation of the modified form of the assignment, the signing of the letter by Hurowitz directing Miller to pay the amount in question to Grinnell, the execution of the assignment by Hurowitz showing he had assigned $1,410.76 to Grinnell for materials already supplied, the signed acceptance by the Miller Company of such assignment to Grinnell of $1,410.76, and Miller's dispatch of the letter to the surety company enclosing the modified assignment, advising of all the foregoing statements—occurred on the same day, July 20, 1939.

On the same day, Miller sent a check to Grinnell in the amount of $382.86—in accordance with the letter of direction to that effect signed by Hurowitz—stating that the check was in settlement of materials furnished by Grinnell to Hurowitz for June 1939.

Later, on August 24, 1939, Miller sent Grinnell another check in the amount of 1,027.90. On the check, it was recited that it was in settlement of "Assignment 1410.76 Harry Hurowitz to Grinnell Co. Less Previous Payment 382.86 Bal. in full Ogontz Manor Apts. 1027.90". This check was enclosed in a letter to Grinnell in which Miller stated that it represented the balance in full of assignment of Harry Hurowitz to Grinnell Company for materials on the job in question.

The trial court held that the language of the surety's letter of July 17 to Grinnell restricted the Miller Company's acceptance of assignments, to the partial assignments that had been made by Hurowitz prior to July 17; that, accordingly, the reference in the letter to "assignments" did not relate to the instrument which had been drafted and proposed by Grinnell during the previous month, in which it was provided that Miller was to pay Grinnell's account up to an

amount of . $50,000; and that, therefore, since no further evidence was offered on this point, there was no proof of any consent by the surety that Miller could pay the Grinnell account direct. We agree with the conclusions of the trial court in this regard.

The letter in question, from the surety to Grinnell, spoke of "partial assignments" which Hurowitz had executed from time to time and had delivered to the General Contractor for material already supplied, and stated that it was satisfactory to the surety that Miller accept and honor the assignments "which have been executed" by Hurowitz. The contract, which had first been proposed by the three representatives of Grinnell providing for the assignment by Hurowitz of funds due him from Miller and for Miller's agreement to pay Grinnell direct, would certainly not have been the instrument described in the language of the surety's letter of July 17, as "partial assignments."

The contract, relied upon by appellant, was a single instrument complete in itself. It could not be the "assignments which *have* been executed by Mr. Hurowitz", as described in the surety's letter; nor could such contract have been the "assignments" executed by Hurowitz "from time to time". No more could it have been executed by Hurowitz "for materials already supplied", as recited in the surety's letter, inasmuch as the contract upon which plaintiff based its case was conditioned upon the agreement, as stated therein, that "Grinnell *will* furnish certain of the material to Hurowitz for such work."

But appellant claims there was no evidence of any assignments executed by Hurowitz to Grinnell prior to July 17, 1939, the date of the surety's letter to it, other than the contract and assignment providing that Miller would pay Grinnell's account; and that, therefore, the surety must have been referring to and approving such contract—when, in the letter to Grinnell, it spoke of "assignments".

Instead of fixing our attention on the possible understanding between the surety company and Grinnell, let us proceed to the crucial question of what was the understanding between the surety and Miller on this matter of assignment. The surety's letter to Miller, written the same day as its letter to Grinnell, enclosed a form of assignment which referred to other assignments *previously made by Hurowitz to* Grinnell *for materials supplied, which already had at that time been accepted by* Miller. This, assuredly, was evidence that Hurowitz had made assignments from time to time to Grinnell, or, to say the least, that the surety company and Miller thought that he had, and were proceeding upon this understanding—and that such assignments were what they referred to.

Certainly, there could be no dispute that, in their letters, the surety company and Miller were talking about such assignments —made from time to time by Hurowitz for material already furnished—no matter what conclusion Grinnell might be justified in drawing from the language of the surety in its letter to it of July 17. If the surety did not give its consent to Miller to sign an agreement to pay Grinnell's account, the fact that Grinnell drew the mistaken inference that it did so consent would not render Miller liable on any theory, unless Miller misled Grinnell in some way—which claim is not here asserted.

Moreover, on July 20, after endorsing and cashing the check heretofore mentioned for $382.86 "for materials furnished by Grinnell to Hurowitz", Grinnell also, on August 24, 1939, received, accepted, and cashed another check from Miller in the amount of $1,027.90, which, on its face, recited that it was *in settlement of the assignment of $1,410.76 from Hurowitz to* Grinnell less the previous amount of $382.-86. And this check was sent to Grinnell in a letter from Miller stating that it was *the balance in full of the assignment of Hurowitz to Grinnell*. With this evidence, we are forced to conclude, that, in spite of its present denials, Grinnell was, itself, aware of the fact that Hurowitz had executed an assignment to it, other than the proposed contract providing that Miller would pay its account up to $50,000, and that Miller had accepted such assignment. This completely contradicts Grinnell's contention that the only assignment, to which the surety and Miller were referring as being executed by Hurowitz, was the contract providing for the assumption of his account by Miller, and that this was the assignment which the surety approved in its letter to Grinnell of July 17.

All of the foregoing discloses that not only was the proof clear that there was no consent on the part of the surety to the proposition of Miller's paying Grinnell for the Hurowitz account, but there was no justification for any conclusion on the part

of Grinnell that the surety so consented; and even if Grinnell were justified in concluding from the surety's letter to it of July 17 that the surety was consenting to Miller's assumption of the payment of Grinnell's account, such conclusion on the part of Grinnell would not have rendered Miller liable for the account on any theory, if the surety had not actually given such consent to Miller.

■ However, the great weight of the evidence shows that Grinnell never believed that the surety consented to the contract in question and, that it, therefore, never, as a consideration for the furnishing of the plumbing material to Hurowitz, relied either upon the claimed agreement by Miller to assume the Hurowitz account, or the claimed consent of the Surety to Miller's assuming such account.

■ The evidence, to sustain this latter conclusion, serves also to disprove appellant's contention that Miller orally promised to pay Grinnell for the material supplied to Hurowitz, and is reserved for our discussion of the last phase of the case, to which we now come.

It will be recalled that the alleged statements upon which plaintiff bases its case were claimed to have been made by Miller, first, to the salesman, Hepburn, and subsequently to Hepburn, Rice, and Reiter, the three representatives of the Grinnell Company, on June 21, 1939.

In the first statement to Hepburn, Miller was asserted to have said—in reply to the expression of Hepburn's doubts that Grinnell would trust Hurowitz for the order—that he, Miller, would see that Grinnell was paid. Did Grinnell rely on this oral promise to pay for Hurowitz's obligation up to a total of $50,000? Every circumstance in the case and all of the subsequent conduct and statements of the agents and representatives of plaintiff negative such a reliance and such an agreement. For the very next occasion on which Miller saw Hepburn, the latter was accompanied by the two officials of the Grinnell Company who had already prepared a *written* contract, the terms of which provided that Miller would pay Grinnell direct for the Hurowitz contract; and when they requested Miller to sign it, he told them he had a surety bond for performance by Hurowitz and could not execute the proposed contract without the surety's consent. Grinnell, therefore, learned, at that time, that Miller was protected against any fail-

ure on the part of Hurowitz, by a $93,000 bond. This was the only reason given by Miller why he could not sign the written contract presented to him by Grinnell. Obviously, he could not take the least chance on any action on his part that might result in forfeiture of the bond or discharge of the surety. Grinnell was certainly not going to rely upon, and did not rely upon, an oral agreement, claimed to have been made to Hepburn, while it was insisting, subsequently, as a condition of the delivery of its material, on the execution of a written agreement by Miller, to the same effect, which Miller refused to sign. The claimed statement made to Hepburn, was never considered by the parties as an agreement.

But Hepburn says that at this later meeting with the three representatives, when Miller told them he could not sign the agreement to pay their account unless the surety approved, he, nevertheless, told them not to hold up the job, but to give Hurowitz whatever he wanted and he, Miller, would see that it was paid. Was this alleged statement an agreement by Miller to pay its account up to the amount of $50,000, and did Grinnell rely upon it as such?

Hepburn said that when he asked Miller about the matter, in the presence of the other two representatives of Grinnell, Miller had just stated he could not sign the agreement until the surety approved; that Hepburn had then remarked that they did not know how long it would take for "this matter to be settled," and that in the meanwhile, Hurowitz was holding up the job, and "what do you (Miller) want us to do." The trial court held that any statement that Miller might have made, about giving Hurowitz what he wanted, as testified to by Hepburn, was directed only toward assuming a liability, "in the meanwhile", until the matter was "settled" and, in effect, that the matter was settled when Grinnell agreed to accept payment for materials direct from the surety on July 20, 1939. When Grinnell agreed to this latter transaction, it informed Miller that the amount then owed to it by Hurowitz was $1,410.76. This was the amount paid thereafter by Miller to Grinnell in two checks reciting that it was in full *settlement* of the balance on the Ogontz Manor job.

Reiter, Grinnell's Philadelphia office manager, in his account of the incident, said that Miller did not state that he would agree to pay up to $50,000 for the plumbing

material. He testified that no amount of money was mentioned in the conversation. His understanding was that Miller was suggesting a delivery of some material on the job, for which he would pay, and that in the meantime, an arrangement would be worked out about payments that would be satisfactory to Grinnell—"until such time as the matter be straightened out, the Miller Company would pay for the material delivered." He stated that Grinnell did not want to leave the matter to an oral agreement but wished to have something in writing. He inferred "that in due course, the thing would be straightened out and the proper paper would come through." Reiter thought that the letter from the surety of July 17, stating that it was satisfactory to have Miller accept and honor the assignments which "have been executed by Mr. Hurowitz", was the consent of the surety to the proposal that Miller should pay Grinnell for the Hurowitz account. We have heretofore demonstrated that this conclusion was wholly unwarranted and contrary to the actual fact.

There is no reasonable inference that can be drawn from the foregoing testimony, other than that Grinnell accepted the above mentioned checks totaling $1,410.76 *in settlement of all direct liability on the part of Miller for material supplied to Hurowitz prior to July 20, 1939.* Taking Hepburn's testimony at face value, the payment of $1,410.76 was exactly what he testified that Miller had agreed to, in consideration of Grinnell's furnishing materials to Hurowitz until the matter was settled. It was settled on July 20, 1939.

Rice, the credit manager, testified that at the time the three Grinnell representatives met with Miller, the latter said that he would pay for the materials furnished to Hurowitz by Grinnell until he told them to stop.

The testimony of Rice was taken by deposition. On cross examination, he admitted that when Grinnell agreed to accept payments direct from the surety company for materials furnished to Hurowitz, that meant he, as credit manager, was no longer going to look to Miller for payment. He further testified that credit was thereafter extended to Hurowitz on the basis of the surety company's agreement to pay Grinnell direct; that Grinnell, in furnishing credit by way of the delivery of the materials, relied "on sufficient funds being available from the General Contractor to the

Surety Company to pay out account in full;" and that it did not expect Miller to pay the Grinnell account direct under the terms of the arrangement between Grinnell and the surety company. Toward the end of his testimony, in answer to a question from Miller's counsel, Rice stated that he had never received the tripartite agreement. The next question was asked by counsel for Grinnell: "If you gave any testimony on your direct examination to the contrary, do you wish to correct that?" Now, certainly, this suggestion of a correction of testimony, "to the contrary", referred to the answer above mentioned. Miller's counsel then objected, "unless the witness is first afforded an opportunity to see what his testimony was and give the man a fair chance to give a truthful answer." Counsel for Grinnell then said: "We will let the witness correct his testimony later after he reads his deposition, if he so wishes."

In accordance with this informal understanding, obviously directed toward the single answer he had just given, the witness, Rice, when he saw the transcript of the questions and answers, altered—without the knowledge of Miller or his counsel—most of his testimony on material, important and crucial points—repeatedly changing his answers to simple, easily understood questions, from "Yes" to "No", or gratuitously adding remarks to destroy the force of that to which he had testified. As an instance, he was asked, on cross examination, whether it was not a fact that after July 20, the materials were furnished on the faith and credit of the arrangement with the surety company. His answer was "Yes." When he secured the stenographer's transcript, he changed the answer to "No" without the knowledge of Miller's counsel. As another instance, he was asked: "That meant that you were no longer going to look to Miller for payment; isn't that true?" Rice's answer was "Yes." Without the knowledge of Miller's counsel, Rice thereafter changed the answer to: "Yes. Provided he paid the surety all the $90,000 odd to be paid on the Hurowitz contract." When Rice was asked, at another time, whether "you would, and you did, extend credit to Hurowitz on the basis of the agreement of the surety company made through Mr. Woolsey; isn't that so?", he replied: "The answer is yes." This answer was changed in the same manner as the other answers to the following: "The answer is yes. As

part of the agreement that Miller would pay to the surety the $90,000 odd to be paid on the Hurowitz contract so that the surety could in turn pay us."

The significance, credibility, and weight of these changed answers may be judged by observing that there was no testimony in the case that Miller agreed to pay the surety $90,000 on the Hurowitz contract so that the surety, in turn, could pay Grinnell. All of the changed answers of Rice, made after his testimony was given and without the knowledge of opposing counsel, was similar to the foregoing. Without any further explanation than appears in the case, no reasonably intelligent man could place any credence in such bald assertions, so manipulated into the record under the pretense that it constituted testimony. For it was not testimony in any sense of the word, and it was contradicted by the actual testimony of the witness himself, previously given.

Complainant's contention that, in furnishing material to the job, it relied upon an oral promise on the part of Miller to pay its account, rests merely upon a few flimsy assertions, contrary to all the documentary evidence, inherently incredible, and wholly incompatible and inconsistent with all of the surrounding circumstances and probabilities in the case. These latter we here outline.

Miller was protected against loss on the plumbing job by a $93,000 performance bond. He refused to sign a contract to pay the Grinnell account, unless the surety approved; and the surety never approved. Before consenting to the assignment by Hurowitz to the surety company, Miller insisted that arrangements be made to settle all claims the Grinnell Company might have up to that date—and the claims were thereafter settled by Grinnell accepting Miller's checks in full payment thereof. After the assignment by Hurowitz to the surety, Grinnell never again looked to Miller for any of the payments for material supplied; and subsequent thereto, all payments for material were made by the surety to Grinnell except as above mentioned. When there was no more money forthcoming from the surety to Grinnell in April, 1940, Grinnell stopped further shipment of material, until Miller entered into an agreement with Grinnell to pay for future deliveries. At that time, there was $29,000 due Grinnell. But Miller was not asked for this amount or any part of it.

Yet on Miller's agreement to pay for future deliveries, shipments of material were at that time resumed. If Grinnell was relying on Miller's oral promise to pay the entire account up to $50,000, there was no conceivable reason to stop delivery of material simply because payments were not forthcoming from the surety. Grinnell would have had Miller to collect from. Yet Grinnell never asked Miller for the money. It resumed shipments only when Miller agreed to pay for future deliveries. But if Grinnell was relying on Miller's oral promise as claimed, it would not have stopped shipments—nor would it have required a new promise by Miller—and it never would have asked Miller to pay only for *future* deliveries, made after April, 1940, as a condition of supplying further material, if Miller had, at that time, owed Grinnell $29,000 on an oral promise.

After Miller had agreed to pay for the material delivered subsequent to April 11, 1940, Grinnell made written demands on the main office of the surety and the surety's agent in Philadelphia, stating that Grinnell had a claim against Hurowitz, in accordance with an agreement with the surety company, and that in consideration of such agreement, it had furnished materials on which there was an unpaid balance of $28,934.02. These demands further stated: "We are, therefore, looking to you for payment of this balance and request that you please acknowledge this claim, advising us when settlement will be made." Within a week of this first demand, Grinnell made a further demand upon the agent of the surety company in Philadelphia and its main office in New York, demanding to be informed "by return mail when you will meet this obligation." Thereafter, and during the year 1940, Grinnell commenced suit against Hurowitz and the surety company in the Common Pleas Court of the County of Philadelphia. The suit was founded upon the performance bond given by Hurowitz and the surety company to Miller. The case was dismissed on the ground that the bond was to Miller and that Grinnell had no right to sue thereon.

Subsequently, in the following year Grinnell again commenced suit against the surety company in the United States District Court in New York, alleging that the surety had represented to Grinnell that it was obtaining an assignment of the moneys due Hurowitz under the subcontract and

that the surety promised Grinnell that if it furnished materials, 90% of the bills would be paid each succeeding month and the balance upon completion of the subcontract. Grinnell further alleged that it furnished the materials in question "in reliance of defendant's representations and promises". In a bill of particulars, Grinnell stated that it furnished material on representations that were both oral and written; that the oral representations were made by Mr. Woolsey, an attorney representing the surety company, and were to the effect that he advised Grinnell that the surety was obtaining an assignment of all moneys due Hurowitz and that plaintiff's charges for materials would be paid by the surety as the payments were received by the General Contractor. The written representations relied upon by Grinnell consisted of the surety's letter of July 17, 1939. This suit was settled upon the payment of $20,000 by the surety company to Grinnell, without prejudice to the surety company's suing Miller for the total amount due on the Hurowitz contract of $29,564.77. Grinnell agreed in the contract of settlement to repay the surety company out of any moneys collected in the instant case from Miller any sum in excess of the difference between $29,564.77 and the sum of $20,000 which the surety paid to it. No demand was ever made by Grinnell against Miller or the Miller Company until the present suit was started December 31, 1942, more than three and a half years after the alleged oral promise had been made by Miller and more than two and a half years after Grinnell had made its demands upon the surety for payment of the account. No charge was ever made against Miller on Grinnell's books.

Moreover, all of Grinnell's claims in this suit are inconsistent—that it relied upon Hurowitz as the agent of Miller; that it relied on Miller's agreement to sign the requested contract; that it relied on Miller's oral agreement to pay its bill direct. If any one of these claims were true, the others could not be. Yet appellant contends that it relied upon Miller's agreement to sign the contract with the same fervor with which it contends that it relied upon Miller's oral agreement to pay its bill direct.

Grinnell's conduct was wholly inconsistent and incompatible with any claim or charge against Miller during the time when practically all of the material was delivered and for a period of approximately three years thereafter. Yet it never contended, and does not now contend, that its actions, or failure to act, were due to its being deceived, misled, mistaken, or ever ignorant of its rights. It suggests no explanation. It leaves the inferences to be drawn by reasonable men; and the only inference that can be reasonably drawn from such unexplained conduct and all of the other circumstances in the case is that it never secured an oral agreement from Miller on reliance of which it shipped material to the job.

When the evidence given at the trial, with all the inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. Randall v. B. & O. R. Co., 109 U.S. 478, 3 S.Ct. 322, 27 L.Ed. 1003; Patton v. Texas & Pacific R. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361. Otherwise stated, if the evidence is of such conclusive character that a verdict returned for one party, whether plaintiff or defendant, would have to be set aside in the exercise of a sound judicial discretion, the trial court should withdraw the case from the jury and direct a verdict for the other party. Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S.Ct. 300, 69 L.Ed. 597; see also: Oklahoma Natural Gas Co. v. McKee, 10 Cir., 121 F.2d 583; Wheeler v. Fidelity & Deposit Co., 8 Cir., 63 F.2d 562; First Nat. Bank & Trust Co. of Muskogee v. Heilman, 10 Cir., 62 F.2d 157; United States v. Stewart, 61 App.D.C. 115, 58 F.2d 520. This is so even when the evidence on the trial was conflicting, if it was so conclusive that a contrary verdict would have been set aside. National Mut. Casualty Co. v. Eisenhower, 10 Cir., 116 F.2d 891; Mutual Benefit Health & Accident Ass'n v. Snyder, 6 Cir., 109 F.2d 469; Farr Co. v. Union Pac. R. Co., 10 Cir., 106 F.2d 437; New Amsterdam Casualty Co. v. Farmers' Coop. Union, 8 Cir., 2 F.2d 214; Peck v. Stafford Flour Mills Co., 8 Cir., 289 F. 43; Ewert v. Beck, 8 Cir., 235 F. 513. And where the evidence was conflicting and the trial court has directed a verdict, the appellate court may not lawfully reverse the judgment founded upon it unless upon a consideration of the evidence, it is convinced it was not of such a conclusive character that the court below, in the exercise of a sound discretion, should not have sustained a verdict in the opposite direction.

356

Foye Lumber Co. v. Pennsylvania R. Co., 8 Cir., 10 F.2d 437. The rule followed by the courts of New Jersey is similar to that applied by the federal courts. Baldwin v. Shannon, 43 N.J.L. 596. See: McCormack v. Standard Oil Co., 60 N.J.L. 243, 37 A. 617; Weatherby v. Newfield Smyrna Rug Co., 80 N.J.L. 364, 78 A. 190.

We agree with the district court that the evidence was of such a conclusive character that, had the case been submitted to the jury and a verdict returned for the plaintiff, the trial court, in the exercise of a sound judicial discretion, would have been obliged to set it aside; and that, accordingly, there was no error in directing the jury to return a verdict in favor of appellees.

The judgment of the district court is affirmed.